# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #005

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **30th day of January, 2019**, are as follows:

**PER CURIAM**:

2018-KK-0711      STATE OF LOUISIANA v. MELVIN MIGUEL (Parish of Orleans)

Finding that the totality of the circumstances present here gave the detective probable cause to believe the prescription bottle contained contraband, we find the plain view exception to the warrant requirement applies. Accordingly, we reverse the court of appeal, reinstate the district court's ruling that denied defendant's motion to suppress the evidence, and remand to the district court for further proceedings.

REVERSED AND REMANDED

JOHNSON, C.J., dissents and assigns reasons.
GENOVESE, J., dissents for the reasons assigned by the court of appeal and for the reasons assigned by Chief Justice Johnson.

## SUPREME COURT OF LOUISIANA

## No. 2018-KK-0711

## STATE OF LOUISIANA

## VERSUS

## MELVIN MIGUEL

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FOURTH CIRCUIT, PARISH OF ORLEANS

**PER CURIAM**

Defendant was the driver of a vehicle that was stopped because it had a cracked windshield. Defendant was driving with a suspended driver's license and a fraudulent license plate. In addition, defendant admitted he had been smoking marijuana. Before asking defendant to exit his vehicle, a detective scanned the interior and noticed an orange prescription bottle, with the name on the label peeled off, sitting in the broken driver's side door handle. Defendant and his passengers disclaimed ownership of the bottle.

Defendant exited the vehicle, was handcuffed and *Mirandized*, and placed inside a police vehicle. The detective then retrieved the pill bottle, opened it, and discovered five Hydrocodone pills. Defendant was arrested and charged with possession of a controlled dangerous substance, La.R.S. 40:967. He was also cited for several traffic violations.

Defendant moved to suppress the evidence on several grounds, including that the pill bottle was not immediately apparent as contraband to justify a warrantless search and seizure. The district court denied the motion to suppress after conducting a hearing and reviewing the detective's body camera video. The court of appeal found the district court erred in denying defendant's motion to

suppress. *State v. Miguel*, 18-0233 (La. App. 4 Cir. 4/26/18) (on reh'g) (unpub'd). Relying on *State v. Meichel*, 290 So.2d 878 (La. 1974), the majority found the plain view exception did not apply because the incriminating character of the bottle was not immediately apparent. The court of appeal erred.

The plain view doctrine renders a warrantless search reasonable: (1) if the police officer is lawfully in the place from which he views the object; (2) where the object's incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object. *State v. Gray*, 13-1326, p. 2 (La. 6/28/13), 122 So.3d 531, 533 (citing *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). The only controversy in the present case is whether the prescription bottle's incriminating character was immediately apparent.

The "immediately apparent" aspect of the plain view exception is better stated as probable cause to believe the item in question is or contains contraband, as clarified in *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). In *Brown*, the United States Supreme Court stated, "Decisions by this Court since [*Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)] indicate that the use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Id.*, 460 U.S. 741, 103 S.Ct. at 1543. In the present case, the court of appeal similarly required an unduly high degree of certainty—beyond probable cause—as to the incriminatory character of the evidence.

Regarding probable cause in the context of the plain view exception, the United States Supreme Court stated in *Brown*:

[P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). Moreover, our observation in *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), regarding "particularized suspicion," is equally applicable to the probable cause requirement:

> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."

*Brown*, 460 U.S. at 742, 103 S.Ct. at 1543.

During oral argument, defendant contended that the fact that the name was torn from the label alone was insufficient to give the detective probable cause to believe the bottle contained contraband. That circumstance did not appear in isolation, however. The officer was also aware that defendant was driving with a suspended driver's license, the vehicle had a fraudulent license plate, defendant and his passengers disclaimed ownership of the bottle, and defendant admitted he recently smoked marijuana (while claiming he consumed it all and thus implying none would be found in the vehicle). These circumstances, in conjunction with the suspiciously torn label, when weighed by an experienced law enforcement officer, provided probable cause to believe the prescription bottle contained contraband.

Defendant cites *State v. Meichel*, 290 So.2d 878 (La. 1974) as being directly applicable and requiring suppression of the evidence. In *Meichel*, a town marshal

3

approached the defendant's vehicle as he was having car trouble. According to the marshal, he observed a pill bottle on the passenger's seat. The bottle of pills in question was labeled as being habit forming and that dispensing without a prescription was prohibited. Two sheriff's deputies subsequently arrived and searched the trunk, where they found marijuana. The state argued that the plain view seizure of the pills established probable cause for a search of the automobile, but this court disagreed:

> In the instant case the testimony of the officer making the seizure is clearly to the effect that he did not know the nature of the pills until after he had picked up the bottle and examined it. He did not know at the time he saw the pills that there was a probability that they were contraband and probably evidence. This seizure does not fall within the plain view exception to the warrant requirement. As such the seizure violated defendant's constitutional rights and was illegal.

*Meichel*, 290 So.2d at 880. In *Meichel*, however, there were not the additional circumstances, present here, to justify the seizure and subsequent search of the pill bottle.

Finding that the totality of the circumstances present here gave the detective probable cause to believe the prescription bottle contained contraband, we find the plain view exception to the warrant requirement applies. Accordingly, we reverse the court of appeal, reinstate the district court's ruling that denied defendant's motion to suppress the evidence, and remand to the district court for further proceedings.

**REVERSED AND REMANDED**

SUPREME COURT OF LOUISIANA

No. 2018-CJ-1271

STATE OF LOUISIANA IN THE INTEREST OF A.L.D. AND L.S.D.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
SECOND CIRCUIT, PARISH OF CADDO

**JOHNSON, Chief Justice**

We granted a writ in this termination of parental rights case to determine if the court of appeal erred in reversing a district court judgment terminating the parental rights of the father, C.K.D. After reviewing the record and the applicable law, we find no manifest error in the district court's ruling that termination was supported by clear and convincing evidence and that termination was in the best interests of the children. Thus, we reverse the ruling of the court of appeal and reinstate the district court's judgment, terminating C.K.D.'s parental rights as to A.L.D. and L.S.D. pursuant to Louisiana Children's Code article 1015(6).

**FACTS AND PROCEDURAL HISTORY**

On or about May 4, 2016, the minor child A.L.D. was removed from the care of his mother, N.M.L., and his father, C.K.D. On May 31, 2016, the Department of Children and Family Services for the State of Louisiana ("DCFS") filed a petition alleging that A.L.D. was a child in need of care ("CINC"). During the course of the investigation, one-year-old A.L.D. tested positive for methamphetamines. On June 10, 2016, N.M.L. gave birth to L.S.D., also C.K.D.'s child. At the CINC trial on July 13, 2016, the parents stipulated that A.L.D. was in need of care. The parents were drug-tested, and both tested positive for methamphetamines. L.S.D., a one-month-old

1

infant at the time, also tested positive for methamphetamines. On August 23, 2016, DCFS filed a petition regarding L.S.D., and that child was also adjudicated CINC.[1]

DCFS developed a case plan for the parents, which was approved by the district court. As it relates to C.K.D., the plan required him, among other things, to remain drug free, maintain a safe and stable home that met the basic needs of his children, complete random drug screens, and obtain a legal source of income to support his children. The plan was amended to require that C.K.D. complete parenting classes, anger management, and mental health counseling and to pay $25/month per child to DCFS for the support of his children.

DCFS initially placed the children with C.K.D.'s mother, D.D. In May 2017, DCFS received reports that C.K.D. was improperly living with D.D., and that D.D. was possibly using drugs while caring for the children. C.K.D., D.D., and both children tested positive for drugs. As a result, DCFS removed the children from D.D.'s home and placed them in non-relative foster care with G.B.

DCFS filed a petition to terminate both parents' parental rights on October 9, 2017. As to C.K.D., the petition alleged he struggled to comply with the requirements of his court-approved case plan. Specifically, DCFS alleged that although he participated in Active Recovery and received a certificate of completion for Phase I of substance abuse treatment in November 2016, he tested positive for cocaine and methamphetamines in December 2016. DCFS asserted he continued to test positive for those substances and marijuana in May 2017, and that he struggled to maintain compliance with treatment for substance abuse or mental health counseling despite

---

[1] N.M.L. has three additional children, G.P., A.P., and, T.P., who were removed from the home as well. G.P. and A.P. are the children of T.P., who at the time of these proceedings was serving sentences in the Louisiana State Penitentiary for one count of indecent behavior with juveniles, one count of molestation of a juvenile under the age of 13, and one count of pornography involving juveniles. The third child, T.P., was initially a part of these proceedings, but was later determined to be the biological child of another man, and DCFS's custody to that child was vacated on October 20, 2016.

some initial success. DCFS further alleged that C.K.D. had not maintained a safe and stable home that could support the return of his children, and he has not maintained contact with the agency. The petition also alleged C.K.D. failed to pay $25 per child per month in contributions to the care of his children as required by his case plan and that he had no contact with the children since May 2017.

N.M.L. filed a motion to grant guardianship to her uncle, D.L., and the matters were consolidated for a December 11, 2017, trial. During a two-day trial, the district court heard testimony and considered evidence on both issues, took judicial notice of the non-hearsay portions of the CINC proceedings, and ultimately entered judgment terminating both N.M.L.'s and C.K.D.'s parental rights as to A.L.D. and L.S.D.[2] N.M.L.'s motion to grant guardianship to D.L. was denied, presumably as moot.[3] The district court stated that C.K.D.'s parental rights were terminated pursuant to La. Ch. C. art. 1015(6). C.K.D. filed a motion for new trial, which was denied. C.K.D. appealed the judgment.[4]

The court of appeal reversed the termination of C.K.D.'s parental rights and remanded the case to the district court for further proceedings, ordering that DCFS maintain custody of the children, the CINC proceeding be reinstated, and the children remain placed with their great-uncle, D.L.[5] *State in Interest of A.L.D.*, 52,239 (La. App. 2 Cir. 6/27/18), 251 So. 3d 554 (2018). The court of appeal concluded that DCFS did not meet its burden of proving the elements required for termination under La. Ch. C. art. 1015(6) by clear and convincing evidence. The court reasoned that

---

[2] The district court also terminated N.M.L.'s parental rights as to her other children in the same proceeding.

[3] Although an order denying the motion for guardianship does not appear in the record, the parties all agree that the motion was denied.

[4] Neither N.M.L. nor the children appealed the judgment.

[5] According to all parties, D.L. was certified as a foster parent post-trial and DCFS subsequently placed the children with him.

C.K.D. sufficiently demonstrated "substantial parental compliance" with the case plan and found there was not clear and convincing evidence at trial to indicate there was no reasonable expectation of significant improvement in C.K.D.'s condition or conduct in the near future, particularly considering the short length of time between the time the petition for termination was filed and the trial. *Id*. at 560-61. The court of appeal also noted that although the children did not appeal the termination, their appellate counsel appeared and argued that the district court was manifestly erroneous in its judgment and that the children are bonded with their father, who has made strides towards preserving the parent-child relationship and it was the position of the children's appellate counsel that termination was premature and not in their best interests. *Id.* at 561.

DCFS filed a writ application in this court, which we granted. *State in Interest of A.L.D.*, 18-1271 (La. 9/21/18), 252 So. 3d 490.

## DISCUSSION

Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the state can take against its citizens. However, the primary concern of the courts and the state remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the state. *State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So. 2d 1247, 1254. Louisiana Children's Code article 1015 sets forth the grounds for which parental rights may be terminated. To terminate parental rights, the state has the burden of proving one of the statutory grounds for termination by clear and convincing evidence. La. Ch. C. art. 1035(A). "'Clear and convincing' evidence requires more than a 'preponderance,' but less than 'beyond a reasonable doubt.' Under the 'clear and convincing' standard, the existence

4

of the disputed fact must be highly probable or much more probable than its nonexistence." *In re L.M.M., Jr.*, 17-1988 (La. 6/27/18), -- So. 3d --, n. 13 (internal citation removed). If a ground for termination is found, the district court must then determine whether the termination is in the best interest of the child. La. Ch. C. art. 1039; *State ex rel. L.B. v. G.B.B.*, 02-1715 (La. 12/4/02), 831 So. 2d 918, 922.

The district court terminated C.K.D.'s parental rights on the basis of Article 1015(6), which provides:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Thus, under this Article, DCFS had to prove three elements: (1) it had been one year since the children had been removed; (2) C.K.D. had not substantially complied with the case plan for services; and, (3) there is no reasonable expectation of significant improvement in C.K.D.'s condition or conduct in the near future. The dispute in this case centers on elements two and three.

**Lack of Substantial Compliance with Case Plan**

Children's Code article 1036 provides that lack of parental compliance with a case plan under Article 1015(6), may be evidenced by one or more of the following:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster

5

care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

At trial, Tiffany Allen from DCFS testified she is the case manager assigned to this case. Although she had personally only been involved in the case since April 2017, she had reviewed and was familiar with all agency records and information concerning the parents. Regarding C.K.D.'s case plan compliance, she testified he had submitted to random drug tests, but no extended period of sobriety had been exhibited. She had no contact with C.K.D. from the end of May 2017 until October 2017. During that time, C.K.D. did not see his children. She attempted to visit C.K.D.'s home more than once, but was unable to find him there. She testified the house appeared abandoned with a lot of debris and trash in the yard, and her photographs of the exterior of the home were introduced into evidence. She has never been able to access the interior of C.K.D.'s home. Ms. Allen further testified that consistency with mental health treatment has been an issue, and that pattern had not changed as of the time of trial. Additionally, C.K.D. had not made the required contributions to his children's care. Ms. Allen verified that the most significant problem in this case has been substance abuse and whether sobriety was being maintained. In sum, she testified C.K.D. had complied with the parts of the case plan

6

requiring him to obtain a legal source of income, receive counseling, and comply with random drug testing. However, she testified C.K.D. had not been compliant with parental contributions, maintaining a secure and safe home, and he was still struggling with substance abuse issues.

C.K.D. also testified at trial. He explained that he had been working for Valvoline for two weeks, although he was previously working for Roshdoe Foundation Repair for 7 months prior.[6] He admitted that he has used drugs on and off for the last 20 years (since he was 18 years old) and his longest period of sobriety has been 19 months. C.K.D. testified that he completed Phase 1 of Active Recovery substance abuse treatment in November 2016, but admitted he relapsed in February 2017. After he tested positive for drugs in May 2017, he cut off contact with DCFS and his children for fear he would be arrested for drug use. He did not begin to participate in program services again until the end of October 2017. C.K.D. admitted he had not paid the required contribution for the care of his children, but testified he did contribute to their support during the time they were placed with his mother. C.K.D. conceded that he was living with his mother in May 2017 when the children were placed there, and that the children tested positive for drugs during this time. He stated he "caused contamination probably." He admitted that he had not completed all components of the case plan and needed 3-6 months to complete it. He further admitted that he had not maintained a stable home environment for six months, claiming that what DCFS would consider a stable home and what he considered livable are two different things. C.K.D. had some difficulty explaining the condition of the house, but described it as outdated and cluttered. He stated the house is a family home that originally belonged to his grandmother, and is now owned by his

---

[6] C.K.D. explained it was his understanding from the court that his IRS 1099 reported income from Roshdoe was not sufficient and he needed to obtain employment with reported W-2 income.

mother. He testified the house had issues from being unlevel, some of which he claimed had been repaired. He testified the living room was "like a storage unit" and stacked with boxes. He admitted there was a lot of furniture outside on the side of the house. He claimed the house was livable, but not up to DCFS standards, and that it was 90% complete. C.K.D. testified he had been living in the house for five months at the time of trial, but that the house had been abandoned since 2013. He additionally testified that if the house was deemed unfit by DCFS, he would obtain an apartment. C.K.D. testified he was currently enrolled in Active Recovery for substance abuse treatment, parenting classes and anger management classes. He claimed he had not used drugs since June 2017.

C.K.D. also introduced into evidence a letter from Active Recovery dated 12/5/17 confirming he was currently enrolled in intensive outpatient substance abuse, parenting, and anger management programs, and that he was attending consistently and participating in a productive manner. The letter stated that C.K.D. was assessed for the program on 10/30/17, and as of 12/5/17 he had completed 14 of 24 substance abuse counseling sessions, 4 of 10 parenting sessions and 5 of 10 anger management sessions.

The state introduced C.K.D.'s drug screening results from Company Clinic of Louisiana, reflecting the following:

- 7/13/16: hair specimen positive for amphetamine, methamphetamine and marijuana

- 7/13/16: urine sample positive for amphetamine, methamphetamine, benzodiazepines and marijuana

- 12/29/16: urine sample positive for amphetamine, methamphetamine and cocaine

- 12/29/16: hair specimen positive for amphetamine, methamphetamine, benzoylecgonine and cocaine

- 5/18/17: hair test positive for amphetamine, methamphetamine, benzoylecgonine, cocaine, and marijuana

- 5/18/17: urine sample positive for amphetamine, methamphetamine, cocaine, and marijuana

- 10/19/17: urine test negative

- 11/17/17: hair test positive for cocaine

- 11/17/17: urine test negative

Following the close of evidence and after hearing argument from counsel, the district court issued a verbal ruling terminating C.K.D.'s parental rights:

| The Court: | The Court in this case does find that the evidence warrants a termination of parental rights as to each of the … children as to each of the parents. The state has established by clear and convincing evidence that the state is entitled to termination of [N.M.L's] rights and [C.K.D.'s] rights and the children's reciprocal rights to their parents. |
| --- | --- |
| | And the Court also finds particularly that termination of the parental rights in respect to [A.L.D. and L.S.D.] is in each of those children's best interest. |
| | *** |
| [C.K.D.'s attorney]: | Your Honor, can you specify which grounds? |
| The Court: | I can. *** With respect to the father, it is under 1015(6). |
| | *** |
| [DCFS attorney]: | Your Honor, do the children remain in the custody of DCFS? |
| The Court: | They are continued in the custody of the department with no recommendations as to placement. I'm leaving that in the department's discretion. *** |

The district court did not provide written reasons for its ruling.

In reversing the district court's ruling, the court of appeal noted the "lack of precise reasoning" by the district court. As to whether C.K.D. had "substantially

9

complied" with the case plan, the court of appeal stated:

> Regarding C.K.D.'s "substantial" compliance with his case plan, probably the most serious aspect would be his substance abuse. …C.K.D. testified that he completed "phase one" on Active Recovery regarding his substance abuse. At the time of the hearing, he was back at Active Recovery as an outpatient receiving services for parenting, anger management, and substance abuse. A DCFS case worker also testified that C.K.D. was compliant with her requests for random drug tests, a specific component of his case plan. While C.K.D.'s condition is of great concern, we do not believe the trial court gave enough emphasis to the progress C.K.D. has made toward being drug-free, particularly his "substantial" compliance. Clearly, C.K.D. has not disregarded the issue. In taking random drug screens and pursuing consistent substance abuse treatment, C.K.D. is exhibiting substantial effort to overcome his habit and substantially comply with his case plan. As to providing a home for the children, it is evident that the house appeared in disarray and disrepair when a DCFS case worker visited. However, the house has belonged to his family for some time, which weighs in his favor, and he has stated he knows it must be improved. Again–he made an effort forward in this regard and has not totally disregarded the case plan's requirements. Some consideration should be made for an attempt to comply, especially where such a drastic action is in consideration. Finally, he had worked seven months for a house foundation repair company, but had recently secured permanent employment, which he expressed was the desire of the court. All of these actions, although admittedly not perfect adherence, were in furtherance of his case plan and show an attempt to comply. Notably, the statute does not require "perfect parental compliance," but "substantial parental compliance."

*A.L.D.*, 251 So. 3d at 560-61.

In this court, DCFS argues the record supports the district court's ruling and it is clear C.K.D.'s compliance with the case plan was still an issue at the time of trial. The district court was actively engaged at trial and heard all the witnesses and was given an opportunity to weigh their testimony, and the court of appeal erred by reinterpreting the evidence and engaging in a *de novo* review. DCFS points out C.K.D.'s long-term drug use and limited periods of sobriety, as well as his continued positive drug screens. DCFS argues that although C.K.D. denied drug use after June 2017, he offered no evidence to contradict his positive drug screen for cocaine in November 2017. Further, C.K.D. has failed to provide adequate housing for the

children. Although he claimed to have a home, C.K.D. offered no evidence to demonstrate when, if ever, it would be appropriate for the children. Ms. Allen was never allowed to view the inside of the home, and could not determine whether C.K.D. actually resided in the home because it appeared abandoned from the outside. DCFS argues C.K.D. has never paid the nominal contributions to the care of his children as required by his case plan, despite the fact that he has purportedly obtained employment. And, C.K.D. admitted that he had no contact with the children from May 2017 until sometime in October 2017, after the termination of parental rights petition was filed. DCFS argues any one of these failures supports the district court's determination that there had been a lack of parental compliance pursuant to Article 1036(C).

By contrast, C.K.D. argues the record and law supports the court of appeal's decision. He argues that he has complied with several aspects of his case plan, which in the totality of circumstances, amounts to "substantial parental compliance" on his part. C.K.D. notes the district court did not order nominal contributions for the costs of the children's foster care until late October 2017. Thus, by the time of trial he had missed only one court-ordered payment (i.e., his $50 payment for November 2017). Further, C.K.D. cites to his trial testimony that he had nearly completed the renovations on his family home needed to meet DCFS's standards, and also indicated his willingness to move into an apartment if needed. Further, the evidence showed he substantially complied with several other aspects of his case plan: he maintained gainful employment throughout the case; he was complying with random drug screens; he completed a substance abuse program and re-enrolled after relapse; and he was complying with newly added provisions of his plan requiring parenting classes, anger management, and mental health counseling. While the court of appeal

11

noted some evidence of "lack of parental compliance," C.K.D. argues it correctly pointed out that the plain language of Article 1015(6) requires "substantial" compliance, not "perfect" parental compliance.

An appellate court reviews a district court's findings as to whether parental rights should be terminated according to the manifest error standard. *State ex rel. K.G. and T.G.*, 02-2886 (La. 3/18/03), 841 So. 2d 759, 762. Based on our review of the record, we conclude that the state satisfied its burden of proving that C.K.D. has not substantially complied with the case plan. Although C.K.D. made some efforts toward his case plan goals, we do not find those efforts sufficient to regain custody of his children. The conditions that led to removal of the children have not been remedied. *See State In Interest of C.F.*, 17-1054 (La. 12/6/17), 235 So. 3d 1066, 1073.

Unquestionably the primary condition that led to the children's removal in this case was parental substance abuse. Both parents tested positive for drugs at the time the children were removed. Even more troubling is the fact that both children tested positive for drugs. After the children were removed, C.K.D. had a positive drug screen in July 2016 in conjunction with the CINC trial. Despite the case plan requiring sobriety, C.K.D. continued to have positive drug screens in December 2016, May 2017 and November 2017. At trial in December 2017, C.K.D. testified he had not used drugs since June 2017, and that he was currently participating in substance abuse treatment. However, there was evidence of a positive hair follicle drug screen in November 2017 wherein C.K.D. tested positive for cocaine. Although C.K.D. testified he understood he would "test dirty" for three months after drug use, he presented no evidence at trial to explain the positive hair follicle test in November 2017–five months after his last admitted drug use. Based on our review of the record, we find the state proved by clear and convincing evidence that C.K.D.'s substance

abuse issues remain.

The record also supports a finding that C.K.D. has failed to substantially comply with his case plan requirement to provide adequate housing for the children. DCFS presented evidence that the house appeared abandoned and was in a state of disrepair, and that Ms. Allen was never able to gain access to the interior of the home. Other than his own self-serving testimony that renovations to the house were 90% complete to meeting DCFS's standards, C.K.D. presented no other testimony or photographs to demonstrate the condition of the house.

Finally, we find the state met its burden of proving C.K.D. failed to substantially comply with the case plan requirement to provide support to his children. Although C.K.D. claimed at trial he contributed to the care of his children during the time they were placed with his mother, he admitted that he had not paid the required support to the state after the children were placed in foster care. In brief before this court, C.K.D. attempts to minimize this failure by explaining the payment requirement was not added to the case plan until October 2017, and thus he had only missed one such payment at the time of trial. We decline to place much value on that argument. It is worth noting that during oral argument before this court in December 2018, counsel for C.K.D. admitted that C.K.D. had still not made a single required payment under the plan.

In sum, the children were removed from their parents' care in May and July 2016. Although C.K.D. initially participated in substance abuse treatment and completed the first phase in November 2016, he admitted to relapse in February 2017. C.K.D. took *no* action on his case plan from May 2017 until October 2017–he did not participate in services; he did not visit his children; he made no efforts to provide financial contributions to their care; and he cut off all contact with DCFS. Although

C.K.D. demonstrated he was participating in substance abuse treatment, parenting classes, and anger management classes at the time of trial in December 2017, he did not enroll in these programs until the end of October 2017. And, C.K.D. still had a positive drug screen in November 2017. Further, the clear and convincing evidence at trial proved C.K.D. has been unable to provide adequate housing for the children. The fact remains that C.K.D. has not substantially complied with his case plan and the conditions that led to the children's removal persist.

**No Reasonable Expectation of Significant Improvement in the Near Future**

Children's Code article 1036(D) provides that under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
>
> ***
>
> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

The court of appeal found there was not clear and convincing evidence at trial to indicate that there was no reasonable expectation of significant improvement in C.K.D.'s condition or conduct in the near future. *A.L.D.*, 251 So. 3d at 561. In so ruling, the court of appeal specifically noted "there was no expert testimony offered by the state tending to show C.K.D. has no possibility of improvement," and further stated that "with no articulated specific reasons by the district court on this issue, we must determine its conclusion was manifestly erroneous." *Id*. The court focused on the "short period of time" the proceedings had been ongoing, and pointed out C.K.D.'s efforts to obtain more reliable employment, to attain secure housing for the

14

children, and that he appeared to be working on his substance abuse problem. The court of appeal found C.K.D.'s efforts were "more positive in nature and tend to show a more positive trend than negative," and found it more reasonable than not that he would make significant improvement in the future. *Id.*

DCFS asserts the court of appeal erred in concluding the state had failed to establish a lack of reasonable expectation of significant improvement in C.K.D.'s condition or conduct in the near future. Contrary to the court of appeal's apparent suggestion that the state needed to produce expert testimony to show C.K.D. had no possibility of improvement, DCFS argues that the plain language of Article 1036(D) permits the state to establish a lack of any reasonable expectation of significant improvement in the near future through *either* expert testimony *or* an established pattern of behavior. DCFS points out C.K.D.'s long history of drug use and limited periods of sobriety, and details his continued drug use during the course of these proceedings. At trial, C.K.D. denied drug use between July and December 2017, but offered no evidence to explain his positive drug screen in November 2017. Both children tested positive for drugs while in C.K.D.'s care. C.K.D. absented himself from the children's lives between May 2017 and October 2017. DCFS argues this is the established pattern of C.K.D.'s behavior and conduct. He may "work on things" but he never accomplishes a change in his situation or behavior. He still uses drugs and still has no safe home for the children.

C.K.D. argues the court of appeal correctly applied the manifest error standard to conclude that DCFS failed to prove by clear and convincing evidence that there was no reasonable expectation of improvement in his condition or conduct in the near future. C.K.D. argues the evidence shows he was addressing his substance abuse issues; he had recently secured stable employment with a reportable income; he has

15

nearly completed the renovations of his house needed to provide a safe and stable home for the children; and he had started working his newly added case plan provisions by attending parenting classes, anger management, and mental health counseling. C.K.D. argues that in the absence of expert opinion, the court of appeal could discern from the record no established pattern of behavior since the time of removal indicating that he was unable or incapable of exercising parental responsibilities. C.K.D. argues that in the short time frame since removal, he has made substantial efforts to overcome his drug habit, evidenced by his two most recent urine screens from October 2017 and November 2017.

After review of the record, we find the court of appeal erred in reversing the district court's determination. First, any suggestion by the court of appeal that expert testimony was necessary to prove there is no "reasonable expectation of improvement in the near future," is negated by Article 1036(D) which specifically allows proof "based upon expert opinion or based upon an established pattern of behavior." Further, although we acknowledge written or verbal detailed reasons from the district court are certainly beneficial in these cases, there is no mandate for the court to provide such reasons. And, C.K.D. could have requested reasons from the district court as permitted by La C.C.P. art 1917(A).[7]

The record does not support a finding that C.K.D. will be able to remain drug free and provide suitable, safe, and stable housing in the near future. If we consider his established pattern of behavior, C.K.D. has been using drugs for twenty years with only intermittent periods of sobriety. Although he completed the first phase of drug treatment during the pendency of this case, his sobriety was short-lived. C.K.D. has

---

[7] La. C.C.P. art. 1917(A) provides: "In all appealable contested cases, other than those tried by a jury, the court when requested to do so by a party shall give in writing its findings of fact and reasons for judgment, provided the request is made not later than ten days after the mailing of the notice of the signing of the judgment."

continued to test positive for drugs. We recognize C.K.D. testified to his desire to change, however his testimony demonstrated an unrealistic and inflated view of his abilities. For instance, in testifying that he deserves a second chance, C.K.D. stated: "I have never not followed through with something.…When I put my mind to something, I do it…. I will never fail another drug test, ever. Ever. Mark it down, write it, I don't care. I promise you. Come back ten years from now, I bet you I don't fail a drug test." C.K.D. further testified that he only needed an additional 3-6 months to comply with his case plan: "I'll have it all done. Everything. Bigger and better than you want." C.K.D. claimed at trial that he had only failed two drug tests and that he had "done every single thing to the T that you would want or need and more." While directly questioning C.K.D., the district court specifically asked him if he was familiar with the term "grandiosity" and whether that was an issue for him. It is clear the district court did not give much credence to C.K.D.'s testimony and overblown promises. We agree with DCFS that despite some actions taken by C.K.D. towards his case plan goals, there is no basis in this record on which to conclude his conduct will significantly improve in the near future. The state proved by clear and convincing evidence C.K.D. had an established pattern of behavior of drug use and failure to follow things through to completion that has persisted even after removal of the children.

**Best Interests of the Children**

We further find the court of appeal failed to adequately focus on the best interests of the children, which the district court found would best be served by terminating C.K.D.'s parental rights. The purpose of a termination of parental rights proceeding is to "protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs,

by providing a judicial process for the termination of all parental rights and responsibilities and for the certification of the child for adoption." La. Ch. C. art. 1001. This court has explained:

> In all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved. Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if possible, to achieve the child's adoption. The interests of the parent must be balanced against the child's interest, but the child's interest is paramount. More than simply protecting parental rights, our judicial system must protect the child's right to thrive and survive. A child has an interest in the termination of rights that prevent adoption and inhibit the child's establishment of secure, stable, long term, continuous family relationships. While the interest of a parent is protected in a termination proceeding by enforcing procedural rules enacted to insure that the parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount interest of the child. Children have a right to live in a safe, secure environment and to be reared by someone who is capable of caring for them.

*C.F.*, 235 So. 3d at 1075 (internal citations removed).

We recognize that a bond exists between C.K.D. and his children, and we acknowledge C.K.D. presented uncontradicted evidence to this effect at trial. We further note the children's attorney is supportive of the father's position. However, we cannot ignore the fact that C.K.D. has demonstrated an inability to care for his children, primarily due to his long-standing substance abuse problems. We find it extremely troubling that both children have twice tested positive for drugs, either while in the care of C.K.D. or while he was living in the same household. It is paramount that we place the children's best interests above that of their father. "There comes a point when the best interests of the children must be served by terminating parental rights in order to achieve permanency and stability for the children. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parent to be terminated." *State ex rel. S.M.W.*, 00-3277 (La.

18

2/21/01), 781 So. 2d 1223, 1238. In this case, we do not question C.K.D.'s love for his children, however the record does not establish that C.K.D.'s circumstances have improved such that it would be in the best interests of the children for C.K.D. to retain his parental rights.

## CONCLUSION

This court has always recognized that the primary concern of the courts and the state in these cases is to secure the best interest for the child, including termination of parental rights if justifiable statutory grounds exist and are proven. In this case, the state proved by clear and convincing evidence the grounds for termination under Louisiana Children's Code article 1015(6) and that termination was in the best interests of the children. These findings are clearly supported by the record and are reasonable in light of the record in its entirety. The court of appeal erred by substituting its own judgment for that of the district court. Therefore, we reverse the ruling of the court of appeal and reinstate the district court's ruling, terminating the parental rights of C.K.D.

## DECREE

**REVERSED. JUDGMENT OF THE DISTRICT COURT REINSTATED. REMANDED TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS.**