Judgment rendered July 17, 2019
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 52,912-JAC
No. 52,913-JAC
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

No. 52,912-JAC

STATE OF LOUISIANA
IN THE INTEREST OF
C.R.F., JR., T.M.S., J.A.S., AND C.T.J.

No. 52,913-JAC

STATE OF LOUISIANA
IN THE INTEREST OF
J.K.M.S.

* * * * *

Appealed from the
Sixth Judicial District Court for the
Parish of Tensas, Louisiana
Trial Court Nos. 1106 and 1142

Honorable John D. Crigler, Judge

* * * * *

| | |
|---|---|
| LEGAL AID OF NORTH LOUISIANA<br>By: Elizabeth C. Brown | Counsel for Appellants,<br>C.R.F., JR., T.M.S.,<br>J.A.S., C.T.J. and<br>J.K.M.S., Children |
| BRADLEY T. STONE<br>Assistant District Attorney | Counsel for Appellee,<br>State of Louisiana |
| SUSAN E. SKIDMORE | Counsel for Appellee,<br>State of Louisiana DCFS |
| INDIGENT DEFENDER'S OFFICE<br>By: Clinton A. Magoun | Counsel for Appellee,<br>J.M.S., Mother |

INDIGENT DEFENDER'S OFFICE
By: Angela L. Claxton

Counsel for Appellees,
C.J., Sr., C.F., Sr., F.M.,
C.H., and P.S., Jr.,
Named Fathers

* * * * *

Before COX, McCALLUM, and THOMPSON, JJ.

**COX, J.**

This consolidated appeal arises out of the 6th Judicial District, Tensas Parish. The children, C.T.J., J.A.S., C.R.F., Jr., T.M.S., and J.K.M.S. appeal the trial court's judgment terminating their mother's parental rights and certifying them for adoption. We affirm the trial court's judgment.

## FACTS

The four oldest children were taken into State custody on September 2, 2016, upon allegations that the mother was using illegal drugs and leaving the children home alone. On January 30, 2018, the youngest child, J.K.M.S., was removed from the mother's care after allegations of neglect and illegal drug use. The two cases were consolidated and a hearing was held for the termination of parental rights. After a full hearing, the trial court terminated the mother's and fathers' parental rights. The children have only appealed the trial court's termination of their mother's parental rights.

The children all have the same mother, J.S. (hereinafter referred to as "the mother"), whose date of birth is December 31, 1984. Each child's birthday and named father[1] is as follows:

| | | |
|---|---|---|
| C.T.J. (M) | 3/25/2004 | Father: C.J., Sr.[2] |
| J.A.S. (F) | 5/17/2005 | Father: C.J., Sr. |
| C.R.F., Jr. (M) | 6/22/2007 | Father: C.F., Sr.[3] |
| T.M.S. (M) | 3/20/2015 | Father: F.M. |
| J.K.M.S. (F) | 1/16/2018 | Father: C.H. or P.S. |

---

[1] Paternity tests were used to rule out some men as fathers, but the listed fathers have not been confirmed through paternity tests. "John Doe" has been named by the State to represent the unknown biological fathers of the children.

[2] C.J., Sr. has verbally acknowledged both C.T.J. and J.A.S.

[3] C.F., Sr. has verbally acknowledged that he is the father of C.R.F., Jr. and his paternity has been established by court order.

On August 25, 2016, the Louisiana Department of Children and Family Services (DCFS) received a report of alleged neglect and lack of adequate supervision concerning the four oldest children. Tamika White, with DCFS, investigated the allegations and reported the following:

- The mother leaves her children home alone every night to go use drugs. She returns home in the mornings to put the kids on the bus and leaves again with the one-year-old (T.M.S.).

- The mother denied leaving her kids home alone.

- The two oldest children confirmed that their mother leaves them home alone. They both stated that they have smelled and seen their mother smoke weed. They described the weed as a green substance that looks like grass.

On August 25, 2016, a safety plan was put in place which listed Wanda Bowman as the safety monitor. She was to report to the agency if it was known that the mother left her children home alone. The mother called DCFS on August 31, 2016, and stated that she did not have any food and asked for help. DCFS spoke with Ms. Bowman, who stated she would make sure the children ate that night. DCFS provided groceries to the mother the next day, September 1, 2016.

On September 1, 2016, the mother tested positive for cocaine and marijuana. She stated that her last cocaine use was about 2 ½ weeks prior to the drug screen, but admitted that she smokes marijuana daily.

The mother was told on August 31, 2016, that she had to move out of her home due to a lease disagreement and necessary repairs to the home. On September 1, 2016, the safety plan was changed and the mother and her children were to move in with Ms. Bowman. The mother was told by DCFS that she and the children could not stay with her sister. The mother violated the safety plan by not staying at Ms. Bowman's home on September 1st.

DCFS spoke with the police department and was told that the mother had an arrest warrant and would be picked up once she was located.

After the children were removed from her care, the mother enrolled in Rayville Recovery, a drug and alcohol addiction treatment center. She completed the program on October 16, 2016.

The mother's initial family team meeting was held October 24, 2016, and she participated in developing her case plan goals. The goal for each child was reunification with a concurrent goal of adoption. The three older children were placed together and the baby was placed in a separate foster home. At the time of the case plan, family members were still being assessed for possible placement. The mother was given biweekly meetings with the children for one hour every other Monday at the DCFS office. The father of J.A.S. and C.T.J. was given visitation that included phone calls to his children twice a week.[4] C.R.F., Jr.'s father was given the same visitation schedule as the mother, but he was scheduled to visit in the hour after the mother's visit.

The mother's action steps included: (1) random drug screens; (2) a substance abuse assessment; (3) a safe, stable, and clean home; (4) a mental health assessment; (5) a legal income; (6) 6 months sobriety; (7) attending her children's medical appointments; and, (8) parenting classes. The trial court approved the mother's case plan.

Records from DCFS show the following acts occurred after the initial case plan:

- The mother admitted to using drugs on Halloween night (2016) because she was depressed and missing her children.

_____

[4] The father was not given face-to-face time with the children because he lived in Nevada.

- February 13, 2017: the mother consented to a drug screen and tested positive for THC, methamphetamines, and cocaine. She also reported that she had taken an Ecstasy pill the previous day.

- March 29, 2017: the mother stated she would fail a drug screen if given one that day.

- DCFS received reports from individuals stating they had seen the mother walking around town "trying to get drugs." It was also reported that she was exchanging sexual favors for money to purchase drugs. Family members expressed concern that she would be hurt or killed.

- It was suspected that the mother was under the influence of drugs during some family visits.

- The mother did not consistently make her visitation times with the children. She had to confirm her attendance on the Fridays before the meeting. This confirmation had to be added because of the distance the children had to travel for the meetings and the mother failed to show at some meetings or was unavailable when transportation arrived to take her to the meetings. During the visits, she was affectionate with all her children. She was observed playing on the floor with the children, changing diapers, and wiping noses. She asked the children about school, their placement, and other interests.

- She was referred to The Family Resource Center for parenting classes, but they recommended she gain control of her substance abuse before entering the program. They did not feel she would be able to successfully complete the program until her substance abuse was treated. They were willing to enroll her in a three-week program, and the longer 16-week program would be available once she had consistently negative drug screens.

- The mother has dealt with depression throughout her life and abruptly stopped taking her medication.

- As of August 31, 2017, the mother was noncompliant with her case plan goals. She had not completed parenting class or substance abuse treatment.

On November 3, 2017, the mother was offered placement at an inpatient addiction treatment facility. The duration would be 6 months and she would be able to have her baby stay with her while at the treatment

4

facility.[5]  Although she completed the paperwork, the mother declined treatment at the facility.

The family visits initially contained good reports regarding the mother's relationship with all of her children.  After about nine months, the reports stated that the mother failed to interact with all of the children equally.  The reports indicated that she was more bonded with C.R.F., Jr. because she gave him hugs and kisses, but walked by the other children without showing them the same affection.

After being removed from their mother's care, the three older children had multiple placements.  T.M.S. remained with his first placement.[6]  C.R.F, Jr. and C.T.J. both had behavioral issues which resulted in changing placements.  The three oldest children were placed with a relative, but the relative could not be certified as a foster parent so the children were removed from her care.

On December 22, 2017, DCFS changed the case plan from reunification to adoption due to no progress being made in the case plan.

On January 23, 2018, DCFS received a report for neglect/dependency.  The mother's fifth baby, J.K.M.S., was one week old at the time of the report.  The mother admitted to using drugs during the pregnancy.  She admitted to using cocaine two days prior to the report.  It was reported that after using drugs, she fell asleep on the couch with the baby.  There were also concerns about the mother breastfeeding while still using drugs.  Testing of J.K.M.S. came back positive for cocaine and THC.  J.K.M.S.'s

---

[5] The mother was expecting her fifth child, J.K.M.S.

[6] T.M.S. was removed from his first placement briefly to be placed with a relative, but was returned to the first placement.  It is reported that he is well-bonded with his caretaker.

5

hair follicle test was positive for marijuana, cocaine, norcocaine, benzoylecgonine, and cocaethylene. J.K.M.S. was removed from her mother and placed in State custody. The goal regarding J.K.M.S. was initially reunification with a concurrent goal of adoption. After being placed with two different foster parents, J.K.M.S. was placed in the same home as T.M.S.

The mother entered Rays of Sonshine, a drug treatment facility, on February 6, 2018.

On June 7, 2018, the State filed a petition for termination of parental rights in connection to the four oldest children. The State amended the petition to include J.K.M.S. on December 19, 2018.

The hearing on the petition was held January 10, 2019. At the time of the hearing, the three oldest children were 14, 13, and 11 years old, and they requested to stay in the courtroom during the hearing, but were not allowed to do so. None of the alleged fathers attended the hearing. Ms. White, the DCFS investigator, testified at the hearing as to why the oldest four children were removed from the mother's care. She verified what was written in the DCFS reports (as detailed above).

Debra Jordan, DCFS case manager, also testified at the hearing. She confirmed that the goal was initially reunification. She stated that she went over the case plan with the mother and the mother appeared to understand each aspect of the plan. Ms. Jordan testified that the primary concerns in the case plan were that the mother complete parenting classes, substance abuse treatment, and mental health treatment and that she have housing for herself and the children. She testified that after J.K.M.S. was taken into the State's

custody, the mother became proactive about substance abuse treatment. She stated that the mother agreed to a six-month treatment at Rays of Sonshine.

Ms. Jordan testified that because the mother was doing well at Rays of Sonshine, the State began transitioning the children to spending time with their mother. She stated the children started out spending a half a day with her at Rays of Sonshine, and over time, were allowed to spend the weekend with her. Ms. Jordan testified that when she visited the mother to drop the children off to stay a whole week, the mother stated she wanted to leave. The mother told Ms. Jordan about an incident of another girl being kicked out of the program. Ms. Jordan stated that during the incident, the mother "told somebody off," which resulted in her being written up twice. Ms. Jordan informed the mother that if she left, the transition with the children would end because she would not have safe housing. She stated that the mother told her that was okay, and still wanted to leave. The mother left Rays of Sonshine on September 21, 2018.

Ms. Jordan testified that she continued to ask the mother for random drug screens after she left Rays of Sonshine. She stated that on October 12, 2018, the mother had a negative urine screen, but the hair follicle was positive for cocaine; on November 27, 2018, both the hair follicle and urine tests were negative; and, on January 4, 2019, the urine screen was negative. She stated that the mother denied drug use after the October 12 positive result.

Ms. Jordan stated that although the mother left treatment early, she had already completed her first six-month treatment and was actually working on her second six-month treatment. She testified that the mother completed her parenting classes at Rays of Sonshine, and that "she did very

7

well." She stated that the mother received mental health counseling while in treatment, but had only made it to one appointment after leaving Rays of Sonshine.

At the time of the hearing, the youngest two children were still together with a foster mother who is willing to adopt; C.T.J. and J.A.S. were placed at the Louisiana Baptist Children's Home; and, C.R.F., Jr. was with foster parents who were willing to adopt. C.R.F., Jr.'s foster parents have expressed an interest in having C.T.J. and J.A.S. placed in their home, and would adopt them as well.

Ms. Jordan stated that she has talked to the children and they do not wish to be adopted because they would like to return to their mother.

The mother testified and stated that she is working at a laundromat and cleaning houses, has not used drugs since February of 2018, and pays for her water and electricity (although the bills are not in her name). She stated that she continues to receive counseling from the same counselor she used at Rays of Sonshine. The mother testified that she feels she had done everything asked by DCFS and would like the goal to remain reunification.

The trial court also heard testimony regarding Damon Clark. The mother claimed that he was just a friend and did not live in the home with her. However, she told workers with DCFS that the ring she was wearing was an engagement ring from Clark. When she testified at trial, the mother claimed he was just a friend, would visit a couple of times a week, and only stayed the night about once every other week. Clark was an issue at trial because DCFS believed he lived in the home with the mother, and he had a criminal history and drug history. His history meant he would be required to

8

pass random drug screens in order for the children to be in the home with him.  Clark refused the drug screens requested by DCFS.

The trial court found that terminating all parental rights was in the best interest of the children because of their need for a safe, stable, and nurturing permanent placement.  The trial court found that the case plan was not worked.  The trial court stated that the mother did not prove that she has paid any of her child support.  The trial court did not find her credible in stating she had been drug-free since February 2018 because she had a positive hair follicle screening in October 2018.  The trial court also found that the mother was not credible in stating she did not have an intimate relationship with Clark.  The trial court stated that if the children could all be placed in actual homes, that would be "great," but a children's home would be better than being in a home with Clark.  The children were also freed for adoption.  The trial court's judgment was signed on January 10, 2019.

The children now appeal.  The mother did not respond to the appeal.

## DISCUSSION

### *Clark's Criminal History*

Appellants argue that the trial court erred in considering the criminal history of Clark when proof of any convictions was not submitted as evidence.  They argue that La. C.E. art. 609(A) states that for the purpose of attacking the credibility of a witness in civil cases, only the name of the crime of which he was convicted and the date of conviction are applicable.  Appellants assert that the only evidence of Clark's criminal history came through the testimony of Ms. Jordan, who did not bring a copy of his record, only stating what she remembered.  Appellants argue that the trial court used this testimony to determine that Clark was a felon and not suitable to be

9

around the children. Therefore, they assert that the trial court improperly based part of his decision to terminate parental rights on facts that were not in evidence.

La. C.E. art. 609(A) states, in pertinent part, "For the purpose of attacking the credibility **of a witness** in civil cases, no evidence of the details of the crime of which he was convicted is admissible. However, evidence of the name of the crime of which he was convicted and the date of conviction is admissible[.]" (Emphasis added.)

La. C.E. art. 609(A) is applicable to attacking the credibility of a witness. Clark was not called to testify and was not a witness in this case. Clark was only discussed because he lived in the home with the mother and was frequently seen by DCFS at the home.

The trial court stated that the mother's testimony regarding Clark was not credible because her version of events kept changing. The trial judge discussed the mother's multiple answers when asked whether or not she and Clark were in a relationship. At times, she stated they were engaged, at other times she stated the ring was just a gift. Clark was frequently present at the home, although the mother stated he only stayed over about twice every other week. The trial court was concerned that the lease was only for the mother, but Clark seemed to live there as well. Because of Clark's presence and DCFS's knowledge that he is a felon, it was requested that he be drug screened. Clark refused to be drug tested.

In order for the children to return home to their mother, she had to remain drug-free. Because Clark was a frequent overnight presence in the home, although the mother would not admit that he lived there, DCFS required that he work a case plan and submit to drug screenings like the

mother. This was to ensure that the children returned to a drug-free home. The trial court relied on the testimony of the DCFS caseworkers in the assessment of the home and the people who lived there. Clark's criminal record was not brought up to attack his credibility, but to demonstrate why he was asked to comply with DCFS and be drug tested.

In addition to refusing the drug screenings, Ms. Jordan, with DCFS, testified that Clark was violent and aggressive toward her when she asked him for drug screens. Clark's name was given by the mother as a potential father to the youngest child, but the DNA test did not reveal a match. The trial court heard enough testimony about Clark to be concerned about his presence around the children, even if his criminal history is excluded. We do not find that the trial court erred in considering the testimony about Clark in its decision to terminate the mother's parental rights.

*Insufficient Evidence*

Next, Appellants argue that the evidence was insufficient to terminate the mother's parental rights. Appellants point out that the determination should not have been whether to deprive the mother of custody, but what would be in the best interest of the children. They admit that had the State attempted to terminate her parental rights before February 2018, they would "almost certainly have been successful." However, they assert that when the youngest child was born, the mother appeared to truly turn her life around.

Appellants cite La. Ch. C. art. 1015(6) as stating that the State must prove that at least a year has elapsed since the removal, there has been no substantial compliance with the case plan, and there is no reasonable expectation of significant improvement. They detail the timeline and facts

11

of the case and assert that the mother had made significant steps to completing her case plan beginning in February 2018.

The State asserts that the mother did not start to seriously address her drug problem until almost 17 months after the first four children were placed in foster care. It argues that she did not go to Rays of Sonshine until she was court ordered to do so, after the goal was changed to adoption. It asserts that had the mother remained at Rays of Sonshine, the children would have transitioned to living with her full time by January 2019, assuming she remained drug-free. It states that instead of finishing her second 6-month commitment, she chose to return to the same home as Clark, confirming his presence in her life.

The State also points out that the mother did not pass her hair follicle screen on October 12, 2018, meaning she did not comply with the case plan requiring her to be drug free for six months. It also notes that the trial court did not find the mother to be credible, given her changing story regarding Clark. It states that the trial court also found that she failed to obtain safe and adequate housing, pay her parental contributions while the children were in foster care, and follow through with mental health treatment. The State argues that these findings, along with the fact that Clark, who did not cooperate with DCFS, remained in her life, was proof that the mother was unable or unwilling to provide an adequate permanent home for her children.

The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his or her physical, emotional, and mental health needs and adequate rearing, by providing an expeditious judicial process for terminating all parental rights and

responsibilities and achieving permanency and stability for the child. *State v. In Interest of M.L.H.*, 51,956 (La. App. 2 Cir. 1/10/18), 247 So. 3d 929.

In this case, the petition for termination of parental rights and supplemental petition both assert La. Ch. C. art. 1015(6) as the basis for termination, which states:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Thus, under this Article, the State had to prove three elements: (1) it had been one year since the children had been removed; (2) the mother had not substantially complied with the case plan for services; and, (3) there is no reasonable expectation of significant improvement in the mother's condition or conduct in the near future. The State has the burden of proving the statutory grounds for termination by clear and convincing evidence. La. Ch. C. art. 1035(A). Clear and convincing evidence requires more than a preponderance, but less than beyond a reasonable doubt. Under the clear and convincing standard, the existence of the disputed fact must be highly probable or much more probable than its nonexistence. *State in Int. of A.L.D.*, 2018-1271 (La. 1/30/19), 263 So. 3d 860. If a ground for termination is found, the district court must then determine whether the termination is in the best interest of the child. La. Ch. C. art. 1039; *State in Int. of A.L.D., supra.*

In a proceeding for termination of parental rights, the issue of parental compliance with a case plan, the parent's expected success of rehabilitation, and the expectation of significant improvement in the parent's condition and conduct are questions of fact. An appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *State v. In Interest of M.L.H., supra.*

Children's Code article 1036 provides that lack of parental compliance with a case plan under Article 1015(6), may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961

Based on our review of the record, we conclude that the State satisfied its burden of proving that the mother has not substantially complied with the case plan. Although she made some efforts toward her case plan goals after the youngest was born, we do not find those efforts sufficient to regain custody of her children. The conditions that led to the removal of the children have not been remedied.

The children were removed because of neglect and the mother's substance abuse problems. The mother continued to test positive for drugs, while she was pregnant with J.K.M.S. She also continued to use drugs after J.K.M.S. was born, which is especially concerning given that she was breastfeeding. DCFS reported that she would use drugs while J.K.M.S. was in her care and then pass out while holding the baby on the couch. The mother did not make sufficient steps toward working her case plan goals from the time the first four children were taken into State custody until her parental rights were terminated. She did not consistently keep her visitation time with the children at the DCFS office. As recognized by the trial court, the mother did not pay child support while her children were in State custody. She had the opportunity to have her children transition back to living with her while she completed her treatment program at Rays of Sonshine, but chose to leave the program and return to live (at least part-time) with Clark.

Article 1036 also provides that a lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without

15

exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

Article 1036 allows proof based upon an established pattern of behavior. Based on the mother's pattern of drug use, the record does not support a finding that she will be able to remain drug-free and provide safe, stable housing for all her children in the near future. The mother admitted to drug use before and after her children were removed from her care. She admitted to drug use while pregnant and J.K.M.S. tested positive for drugs when she was born. The mother admitted that the utilities were not in her name, but she was the only lessee on the lease agreement. It is clear the trial court did not credit the mother's testimony concerning her relationship with Clark. The mother was required to remain drug-free and provide a safe home. Part of providing a safe home was that it would be a drug-free home. Because of the mother's relationship with Clark and his presence in the home, he would need to submit to drug screens in order to live in the house, ensuring the home is drug-free. The State proved that the mother established a pattern of behavior of drug use and the failure to remain drug-free, even after the children were removed from her care.

The primary concern it to secure the best interest of the child if a justifiable ground for termination is proved. The focus is not whether the parent should be deprived of custody, but whether it would be in the best

16

interest of the child for all legal relations with the parent to be terminated. *State in Int. of A.L.D., supra.* We recognize that there is a bond between the children and their mother. However, we cannot ignore the mother's history of drug use. We find it troubling that she continued to use drugs after her four oldest children were taken and while pregnant with her fifth child. The record does not support the conclusion that the mother's circumstances have improved in such a way that it would be in the best interest of the children for her to retain her parental rights. Additionally, the mother has not appealed the decision from the trial court contesting its determination.

For these reasons, we agree with the trial court's determination that the State submitted sufficient evidence to terminate the mother's parental rights.

*Permanency Hearing*

Appellants argue the trial court erred by failing to conduct a permanency hearing before the termination of parental rights. They argue there are specific rules regarding permanency hearings and written notice of a dispositional hearing. Appellants argue the proper procedure was not followed. They assert that a permanency hearing was set for December of 2018, but the minutes do not reflect that a hearing was held or that it was continued. They argue that even if a permanency hearing was held that day, and the goal could have been changed to adoption in open court, that was not the proper procedure to conduct a permanency hearing. Appellants cite La. Ch. C. arts. 702, 703, 705, and 710.

Appellants assert that although it is true they have been in foster care for a very long time, it is also true that the mother began working her case

17

plan.  They argue the mother's parental rights should not have been terminated.

The State points out that this final issue involves only the baby, J.K.M.S.  The State asserts that the review hearing set for December 6, 2018, was also a permanency hearing for the baby.  It argues that a court report sent to all counsel, and filed in the record, even stated it was a permanency hearing.  The State also contends that permanency hearings are often held concurrently with case review hearings for judicial economy.  The State notes that it is unfortunate the minutes do not capture that the December 6 hearing also involved a case review/permanency hearing for J.K.M.S.

La. Ch. C. art. 710 states, in pertinent part:

A. In a written judgment, the court shall make findings of fact regarding:

(1) The permanent plan that is most appropriate and in the best interest of the child in accordance with the priorities of Article 702(D).

(2) Except as otherwise provided in Article 672.1, whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan.

(3) Whether an out-of-state placement is safe, appropriate, and otherwise in the best interest of the child.

(4) For children whose permanent plan is placement in the least restrictive, most family-like alternative permanent living arrangement, why, as of the date of the hearing, the plan is the best permanency plan for the child and provide compelling reasons why it continues to not be in the best interests of the child to return home, be placed for adoption, be placed with a legal guardian, or be placed with a fit and willing relative.

\*\*\*

C. An extract of minutes of court specifying the information in Paragraph A of this Article and signed by the court shall be considered a written judgment.

18

When appropriate, case review hearings and permanency hearings may be scheduled to be heard simultaneously, provided the record reflects that the appropriate findings and orders are made pursuant to Chapters 15 and 16 of Title VI of the Louisiana Children's Code. La. Ch. C. art. 711.

The record reflects that a review hearing was held regarding J.K.M.S. on December 6, 2018. The review hearing minutes state that the mother and her attorney were both present, and the goal changed from reunification to adoption. On December 17, 2018, the trial judge signed off on the December 6, 2018 permanency/review hearing. The trial court found that the mother and alleged father were given notice of the hearing and right to be heard. The trial court determined the appropriateness of J.K.M.S.'s placement and the mother's extent of compliance with the case plan. The trial court concluded that adoption was in J.K.M.S's best interest, and that DCFS made reasonable efforts to finalize the permanent plan.

We find that Appellants' argument lacks merit. Based on the record, the mother was given notice of a hearing on December 6, 2018, and attended the hearing. In the interest of judicial economy, the law allows for permanency hearings and review hearings to be heard simultaneously. The December 6 minutes reflect that the goal was changed from reunification to adoption. The mother was then given notice of an answer hearing to be held on December 17, 2018 and advised that a petition was filed requesting that her parental rights be terminated. The mother appeared at the December 17 hearing and entered a denial. No objections were made and the trial court signed the scheduling order, amended supplemental petition, and the

19

judgment changing the goal from reunification to adoption.  We find that procedure was followed in the termination of the mother's parental rights.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment terminating the mother's parental rights.

**AFFIRMED.**