NOT DESIGNATED FOR PUBLICATION

**STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT**

**22-37**

**STATE IN THE INTEREST OF**

**N. R. AND J. R.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 33994
HONORABLE W. MITCHELL REDD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN E. CONERY
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, John E. Conery, and Gary J. Ortego, Judges.

**AFFIRMED.**

**Annette Fuller Roach**
**CINC Appellate Project**
**4315 Lake Street, Suite 4**
**Lake Charles, Louisiana  70605**
**(337) 436-2900**
**APPEAL COUNSEL FOR APPELLANT:**
**L. R.**

**James Wade Smith**
**Attorney at Law**
**724 Clarence Street**
**Lake Charles, Louisiana  70601**
**(337) 436-8424**
**CURATOR AD HOC FOR APPELLANT:**
**L. R.**

**Mike K. Stratton**
**Public Defender's Office**
**1032 Ryan Street**
**Lake Charles, Louisiana  70601**
**(337) 436-1718**
**COUNSEL FOR APPELLANT:**
**J. J.**

**Nicholas Pizzolatto, Jr.**
**Louisiana Department of Children and Family Services**
**1919 Kirkman Street**
**Lake Charles, Louisiana  70601**
**(337) 491-2066**
**COUNSEL FOR APPELLEE:**
**State of Louisiana, Department of Children and Family Services**

**Amy E. McGray**
**Child Advocacy Center**
**Post Office Box 3705**
**Lake Charles, Louisiana  70601**
**(337) 491-2461**
**COUNSEL FOR APPELLEES:**
**N.R.**
**J. R.**

**CONERY, Judge.**

This matter comes before the court on appeal of the trial court's August 24, 2021 judgment granting the Department of Children and Family Services' (DCFS) "Petition for Termination of Parental Rights and Certification for Adoption" of the two minor children born of the mother L.R.[1] The first child at issue, N.R., was born on 5/09/2018, and the second child, J.R., was born on 5/10/2019. The trial court in this case presided over these proceedings from their beginning on October 7, 2019, until July 28, 2021, when the hearing on Termination of Parental Rights (TPR) was held, a period of some twenty one (21) months. After taking the case under advisement, on August 12, 2021, the trial court issued its Written Reasons For Judgment terminating the parental rights of L.R. On August 24, 2021 the trial court issued a final Judgment Of Termination Of Parental Rights And Certification for Adoption wherein it adopted its Written Reasons For Judgment and attached same as Exhibit "A" in globo. For the following reasons we affirm.

### FACTS AND PROCEDURAL HISTORY

The two minor children, N.R. and J.R. ages sixteen months and five months respectively, entered into the custody of the State of Louisiana under the supervision of the DCFS on or about October 3, 2019 pursuant to an Instanter Order orally issued and signed on October 3, 2019.

The DCFS became involved with the family when L.R. took N.R. to Lake Charles Memorial Hospital (LCMH) after N.R. began acting differently the day before and was not getting better. L.R. tested positive for amphetamines, however,

---

[1] Uniform Rules-Courts of Appeal, Rules 5-2 provides that "[t]o ensure the confidentiality of a minor who is a party to or whose interests are the subject matter in the proceedings listed in Rule 5-1(a) or (c) above, initials shall be used in all filings and in opinions rendered by the court of appeal to protect the minor's identity." Rule 5-1(a)(4) lists "Involuntary Termination of Parental Rights."

LCMH does not test for methamphetamines. L.R. admitted to a deputy from Child Protection that she had smoked methamphetamines four times the day before. L.R. also mentioned the use of Adderall, for which she admitted she had no doctor's prescription.

N.R. subsequently also tested positive for amphetamines. Law Enforcement searched L.R. and found two pipes in her possession at the hospital. After L.R.'s arrest she was also charged for having in her possession additional drug pipes and methamphetamines, which were found in her purse and on her person. The DCFS was alerted on September 26, 2019 that sixteen month old N.R. had tested positive for amphetamines.

Subsequently, on October 7, 2019, N.R. and J.R. were continued in the State's custody by stipulation, without admission of the mother L.R., or J.J., the father of J.R. Accordingly, on October 7, 2019 a Petition was filed by the District Attorney's Office seeking to have N.R. and J.R. adjudicated Children In Need of Care (CINC).

On November 21 2019, a CINC hearing was held and at the close of evidence both N.R. and J.R were adjudicated Neglected Children in need of care. Custody of both children was maintained with the State. The trial court accepted the Case Plan of DCFS dated November 12, 2019, and each known parent was ordered to comply.

L.R. is the mother of both children. However, N.R.'s father, L.C. , was not identified by L.R. until her testimony at time of trial.[2] J.R.'s father, J.J., was known to DCFS and was given the original Case Plan, which he did not complete. J.R.'s father and L.R. were not living together when J.R. was taken from L.R. on October

---

[2] The father of N.R., L.C., was not identified by L.R. until time of trial. The trial court in its August 24, 2021 judgment ordered DCFS to attempt locate L.C. in order to determine his paternity and if necessary, attempt to work with him or if necessary, file the proper paperwork to terminate any parental rights he may have with N.R.

3, 2019. J.J., the father of J.R., did not appeal the trial court's judgment of August 24, 2021 terminating his parental rights to J.R.

The trial court found that "following the CINC adjudication L.R. made favorable progress on her Case Plan," for approximately ten months, "until the first of two hurricane's hit Calcasieu Parish." L.R.'s home was badly damaged and like many others she evacuated to New Orleans, where she was housed in a hotel. However, "in November of 2020, she voluntarily moved from New Orleans to the State of Georgia, where she stayed until April of 2021.[3] During the approximately five (5) months in Georgia, L.R. pursued work as a singer." The trial court found during this same five-month period, L.R. did not progress in her Case Plan.

On February 26, 2021, a Petition For Certification for Adoption And Termination of Parental Rights was filed against L.R. seeking to terminate her parental rights to N.R. and J.R., and to terminate the parental rights of J.J. to J.R. The termination of parental rights hearing was held on July 28, 2021. The trial court issued written reasons for termination of L.R.'s parental rights to N.R. and J.R. on August 12, 2021, and a final judgment on the termination of L.R.'s parental rights to N.R. and J.R. was signed on August 24, 2021. Counsel for L.R. timely filed a motion for appeal and designation of the record on September 10, 2021, which was granted on September 16, 2021.

## ASSIGNMENT OF ERRORS

L.R. asserts the following assignment of errors on appeal:

1.)     The court manifestly erred in terminating the parental rights of L.R. because the agency failed to show by clear and convincing

---

[3] On July 3, 2020, D.W.B., Jr., then fifteen years old, one of L.R.'s four children who had been previously placed in the guardianship of family members, was returned to L.R. at the request of his guardian. D.W.B., Jr. evacuated with L.R. to New Orleans, but was left with his uncle C.B. and C.B.'s wife when L.R. went to Georgia.

evidence that L.R. abandoned N.R. and J.R. by leaving them under circumstances demonstrating an intention to permanently avoid parental responsibility.

2.) The court manifestly erred by finding clear and convincing evidence was presented to establish that L.R. had not substantially complied with her case plan, that there was no reasonable expectation of a significant improvement in the near future.

3.) The court manifestly erred by finding that the State proved by clear and convincing evidence that termination of L.R.'s parental rights was in the best interests of N.R, and J.R.

## LAW AND DISCUSSION

*Standard of Review*

The Louisiana Supreme Court in the recent case of *State in Interest of A.L.D.*, 18-1271 (La. 1/30/19), 263 So.3d 860, reversed the appellate court and reinstated the trial court's judgment terminating the parental rights of the children's father, C.K.D. The Louisiana Supreme Court again reiterated that the manifest error standard of review was to be applied by the appellate court in its review of termination of parental rights cases. The Louisiana Supreme Court found in *A.L.D.* that, "The district court was actively engaged at trial and heard all the witnesses and was given an opportunity to weigh their testimony, and the court of appeal erred by reinterpreting the evidence and engaging in a *de novo* review." *Id.* at 867.

Accordingly, an appellate court reviews the district court's findings as to whether parental rights should be terminated according to the manifest error standard. *State in the Interest of K.G. and T.G.*, 02-2886 (La. 3/18/03), 841 So.2d 759. This is especially true in this case where the same trial court judge also presided over L.R.'s cases involving her other four children, who were also removed from L.R.'s custody by her agreement, and placed in the guardianship of relatives, the children's parental grandparents and an aunt.

4

The Louisiana Supreme Court in *A.L.D.* further explained:

> Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the state can take against its citizens. However, the primary concern of the courts and the state remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the state. *State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So.2d 1247, 1254. Louisiana Children's Code article 1015 sets forth the grounds for which parental rights may be terminated. To terminate parental rights, the state has the burden of proving **one** of the statutory grounds for termination by clear and convincing evidence. La. Ch. C. art. 1035(A). " 'Clear and convincing' evidence requires more than a 'preponderance,' but less than 'beyond a reasonable doubt.' Under the 'clear and convincing' standard, the existence of the disputed fact must be highly probable or much more probable than its nonexistence." *In re L.M.M., Jr.*, 17-1988 (La. 6/27/18), —— So.3d ——, n. 13 (internal citation removed). If a ground for termination is found, the district court must then determine whether the termination is in the best interest of the child. La. Ch. C. art. 1039; *State ex rel. L.B. v. G.B.B.*, 02-1715 (La. 12/4/02), 831 So.2d 918, 922.

*State in the Interest of A.L.D.*, 263 So.3d at 863 (emphasis added).

A panel of this court in *State in the Interest of J.A.*, 17-500, p. 4 (La.App. 3 Cir. 1/4/18/), 237 So.3d 69, 72, held that "the state bears the burden of establishing each element of a ground for termination by clear and convincing evidence. La.Ch.Code art. 1035. *State in the Interest of B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881." However, the court further stated:

> The statutory grounds for involuntary termination of parental rights are found in La.Ch.Code art. 1015, although "**only one ground need be established.**" *State ex rel. B.H.* [*v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881,] 885. Once a ground for termination has been established, the parental rights may be terminated by the trial court if it is in the child's best interest. *Id.*; La.Ch.Code art. 1037.

*Id*. (Emphasis added).

### *Parental Contributions*

The trial court, in its reasons for ruling, addressed each of the elements contained in the initial Case Plan adopted by the trial court on November 12, 2019

5

and contained in its November 21, 2019 judgment. The initial Case Plan, and each of the Case Plans which followed, contained the following language relating to "Parental Contributions and Legal Income."

> L.R. will be aware that she will be assessed by IV-E and or/child support enforcement to determine the amount of parental contributions and or child support that she will need to pay on a monthly basis to offset the cost of care while the child(ren) are in foster care. Once an amount is established Courtney will provide the worker with documentation of the payments.

The Case Plan further provides that L.R. "secure and maintain legal employment. She will provide employment verification and paystubs to the caseworker on a monthly basis. She will report to the caseworker any changes in employment as it occurs."

L.R. admitted at trial that she had paid no contributions to support her two children. When questioned about her obligation to support her children, she responded "the government is doing it." L.R. testified that she was working online, livestreaming singing, making $600.00 a week, but has yet to receive any "such compensation." L.R. also testified that if she moves to Atlanta, she stands to make over $100,000 annually working for "Def Jams" record company. The trial court found "[H]er testimony about these prospects was remarkably inconsistent, and there was no evidence presented to support her claims."

L.R. testified that she had a "Sugar Daddy" in Lake Charles that pays her $500.00 a week. This testimony was confirmed by her mother, who claimed to know the individual and that L.R. had received money from him in the past. The DCFS worker Ms. Marissa McDade confirmed that L.R. had never provided the agency with any information as to her receipt of funds from this man, and that L.R. had not

paid any contributions to support her two children since they were placed in the care of the State in October of 2019.

*Substance Abuse*

The Case Plan as it relates to substance abuse required L.R. to "complete a behavioral/mental health assessment to explore and/or address mental and substance abuse needs." L.R. was further required to "submit to random drug screens as directed by the agency or substance abuse treatment provider…[I]f [L.R.] test[ed] positive or failed to comply with drug screens she may be referred back to substance abuse treatment."

L.R.'s testimony on the drug issue was also inconsistent. L.R. consistently maintained that she did not have a drug issue, although she testified "that she attended inpatient drug treatment and then resided for a period of time in a halfway house." L.R. claimed that the reason that she engaged in this treatment for drug use is she "wanted to be around people." When she was cross-examined, L.R. ( who continued to maintain she did not have a drug problem) testified that she had used drugs "in November of 2020."

Based on the circumstances that brought the two children to the attention of the DCFS, her daughter N.R. testing positive for amphetamines, and L.R.'s admission that she had used methamphetamines prior to breastfeeding N.R., it is difficult to believe without subsequent testing that L.R. no longer has a drug problem. The trial court noted that "L.R. apparently produced several negative urine drug screens during her Case Plan, however she refused to take a court-ordered hair-follicle test, claiming that 'no one is touching my hair." Ms. Marissa McDade, the caseworker, also confirmed that L.R. had not addressed her substance abuse issues.

7

Further, the trial court found that the two witnesses that testified on L.R.'s behalf, L.R's mother M.R. and her sister B.M. "did not support the position taken or the testimony given by L.R. at trial."

### *Contact With The Children*

The Case Plan called for L.R. to have contact with her children N.R. and J.R. once a week. The trial court found that the evidence presented demonstrated that L.R. "has had very little contact with her children." The trial court further stated that:

> Since the first hurricane in August of 2020, a period of approximately eleven (11) months, she has seen [J.R.] one time, shortly before trial. She went approximately ten (10) months without seeing him. [L.R.] has not seen [N.R.] in nearly a year. Remarkably, [L.R.] missed a scheduled visitation with her children the week before the TPR trial.

The trial court's findings were supported by the testimony of M.R., N.R. and J.R.'s grandmother. M.R. remained in contact with L.R. during the five month period she was pursuing her singing career in Georgia. M.R. testified at trial that L.R. had not seen either of the children in "many, many months." Ms. McDade also confirmed that L.R. had failed to visit with the two children in months. Another of the requirements of her Case Plan was that L.R. keep the "agency worker updated on current mailing, physical address and phone number[.]" She failed to do so.

### *Parenting Class*

L.R. began a court-ordered parenting class shortly before the TPR trial date. At the time of trial, she had attended one class, but L.R, testified that she was missing the second class due to a conflict with the trial. Ms. McDade testified that L.R. has not completed the parenting class.

*Housing*

The Case Plan required that L.R. "will secure and maintain housing that demonstrates appropriate housekeeping skills, is clean and has adequate space, furniture, working utilities and adequate food supply to meet the needs of the children."

L.R. testified at trial that she was presently living in a three bedroom FEMA trailer for a limited period of time. Although Ms. McDade had visited the trailer and found it suitable, L.R. admitted that she did not know how long she would be allowed to occupy the FEMA trailer, possibly eighteen months, and had no plan for housing when the trailer was no longer available. L.R. testified at trial that she planned to move back to Georgia with the two children, "stating she has a home and a job there, but had not shared that information with the agency."

L.R. further testified that her having received the three-bedroom FEMA trailer was based on her having custody of N.R. and J.R. When questioned if "there was any requirement that you have to have your children living there with you, … well, what if your children are not reunited today? Will you be kicked out of that FEMA home?" To which, L.R. responded "Yes." L.R. further testified that D.W.B., Jr., who was returned to her at the request of his former guardian, was presently living with her.

### Status of N.R. and J.R.

The trial court found the following evidence and testimony was provided at trial as to the status of N.R. and J.R. and stated:

> [B]oth minor children are in foster care. They are not placed together. However, they are both now in potential adoptive placements and doing well. [J.R.] has been with the same foster parents for the entirety of the case. He is bonded with them and thriving. He is two (2) years old and had been in custody since he was approximately five (5) months old.

[N.R.] has been in her current placement for several months. She is also doing very well and has caught up with her milestones. She is currently three (3) years old and has been in State custody since October of 2019.

According to the uncontroverted testimony of Ms. McDade at trial, both children have achieved a high level of attachment with their foster parents.

## *Lack of Substantial Compliance With Case Plan*

The trial court found that "The Petition for Termination of Parental Rights" as it related to L.R. was based on her "receiving a court-approved and ordered case plan which was designed to address the issues which led to the removal of the minor children." The DCFS maintained that L.R. had failed to comply with the terms of her case plan and abandoned the children by not making any parental contributions, not visiting them, or otherwise maintaining contact.

Both Louisiana Children's Code Article 1015(5)(b) and 1015(6) provide the grounds for termination of parental rights applicable to this case. The trial court first addressed Article 1015(5)(b) in its written reasons and stated:

As set forth herein, [L.R.] initially was working on the elements of her case plan and cooperating with the agency. Unfortunately for her, as with many, many people in Calcasieu Parish, she was displaced from her home in August of 2020, thanks to hurricanes Laura and Delta. [L.R.] out of necessity, evacuated and stayed in New Orleans for approximately three (3) months at that time. The Court does not fault [L.R.] for that move, which was not unreasonable. However, the astounding portion of the case followed when [L.R.] relocated to Georgia to pursue her singing career, during the pendency of her CINC in Louisiana. That choice resulted in a five-month period where it was more difficult to communicate with DCFS and it was virtually impossible to see her children. Additionally, and importantly, there was no evidence at trial that such a move was necessary. In fact , it was not. While the Court accepts the fact that it may have been difficult to find housing in Calcasieu Parish during that time period, there was no evidence that [L.R.]even made an effort to do so. The decision to take off to Atlanta to pursue her dreams is not justifiable under any interpretation of the evidence presented. Further, as a result of that decision, not only was [L.R] not able to visit with her children, but it also made compliance with her case plan virtually impossible.

10

At the time of trial [L.R.'s] plan to move the children to Georgia is unlikely to be successful. [L.R.] has further shown no inclination to financially or emotionally support her children. She has additionally refused to take the Court-ordered hair follicle drug screens.

Louisiana Children's Code Article 1015(5)(b) defines the grounds for abandonment as follows:

(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . . .

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

The trial court found that at the time of the filing of the petition, to terminate L.R.'s parental rights on February 26, 2021 that L.R. had failed to provide " any significant contribution to the children's care and support for longer than the required six (6) month period." Therefore, the State has met its burden of proof pursuant to La.Ch.Code art. 1015(5)(b) that L.R. had abandoned N.R. and J.R.

Louisiana Children's Code Article 1015(6) discusses the failure to comply with the court-ordered Case Plan and states as follows:

(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

11

In regard to L.R.'s compliance with her Case Plan the trial court found as follows:

> It is clear that, at the time of the filing of the petition, [L.R.] had not achieved substantial compliance with her [C]ase [P]lan. She initially worked the [C]ase [P]lan, but all efforts to further do so stopped at Hurricane Laura and Delta. She has also abandoned her children by failing to support them financially and failing to visit them for the periods of ten (10) months or more. … This leads the Court to the decision that "there is no reasonable expectation of significant improvement in the parent's … conduct in the near future," considering the children's ages and the need for a safe, stable and permanent home. The State has also met its burden of proof regarding the grounds set forth in La.Ch.Code art. 1015(6) as to [L.R.].

### *Best Interests of the Children*

The trial court then addressed the "final element" in the TPR proceeding, "whether termination is in the 'best interests' of the children." The trial court explained that after "[a]pplying that test to the law and facts of this case, the Court hereby finds that the termination of the parental rights of [L.R.] … is in the best interests of the minor children."

## CONCLUSION

The trial court's August 24, 2021 judgment found that the parental rights of L.R., mother of N.R, whose date of birth is 05/09/2018, and J.R., whose date of birth is 5/10/2019, were "immediately[,] permanently[,] and irrevocably terminated and dissolved pursuant to Children's Code Articles 1001 et seq., and more particularly pursuant to Louisiana Children's Code Article 1015(5)(b) & Article 1015(6) as to both children."

The trial court also found that it was in the best interest of the children N.R., whose date of birth is 05/09/2018, and J.R., whose date of birth is 5/10/2019, that the parental rights of L.R., the mother, were "immediately[,] permanently[,] and irrevocably terminated and dissolved."

12

The trial court further found that it was in the "best interest of the children," N.R. and J.R. … "that they remain in the legal custody of the Louisiana Department of Children and Family Services."

Additionally, the trial court in the case of J.R., adjudged him eligible for adoption in accordance with the law. However, as to the father of N.R., who was finally disclosed at trial by L.R as L.C., the DCFS was instructed to locate him and determine his paternity. If he is the biological father of N.R., then the agency was instructed to work with him to reunite him with his daughter, or take the necessary steps to terminate any parental rights L.C. would have as to N.R.

For the foregoing reasons we affirm in its entirety the trial court's August 24, 2021 judgment. All costs of this appeal are assessed to L.R.

**AFFIRMED**.

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3