MADELEINE M. LANDRIEU, Judge.
| iThe Juvenile Court granted a Petition to Terminate Parental Rights as to the mother of a minor child, S.R., and denied a motion for a new trial brought by the mother. The mother now files this appeal. For the reasons that follow, we affirm the judgment of the trial court.
PROCEDURAL HISTORY
In April of 2012, the Department of Children and Family Services (DCFS) received a report that two adults were attempting to enroll a four year-old child in school but were unable to do so because neither had legal custody of her. After a preliminary investigation, DCFS learned that the two adults were the child’s eighteen-year-old sister, K.N., and a non-relative caretaker, Ms. Teri Conrad. DCFS further learned that the child, S.R., had been living with Ms. Conrad and her husband, Mr. Jeff Conrad, since she was an infant and that that child’s mother had *160 moved to Oklahoma sometime in 2011. DCFS also learned that the child’s legal father was not involved in the daily care and supervision of her. Finally, DCFS learned that K.N., S.R.’s big sister, had been living on her own in New Orleans in an apartment since she was sixteen years old, well before their mother had moved to Oklahoma.
| ¡¿Following this preliminary investigation, DCFS requested and was granted emergency custody of S.R. and allowed her to remain in the physical care and custody of Mr. and Mrs. Conrad. A hearing on continued custody was held on June 14, 2012 at which time the court found that it was in S.R.’s best interest to remain in the legal custody of DCFS and in the physical custody of the Conrads. At that time, the court found that placement with the Con-rads was safe, was the least restrictive option and was in the child’s best interest.
In July of 2012, DCFS filed a petition to have S.R. declared a “child in need of care.” In January of 2013, after a hearing pursuant to Louisiana Children’s Code articles 659-667 and 678-686, and pursuant to the stipulation of the parties, the petition was granted, and the court ordered that S.R. remain in the legal custody of DCFS in accordance with a case plan dated December 26, 2012.
According to the case plan, reunification of S.R. with her parents was not an appropriate goal because of their non-compliance with services outlined in the case plan and their abandonment of S.R. Further, it was established that S.R.’s legal father was not her biological father and had no desire to care for her. Finally, the case plan established adoption as the goal for S.R.
On January 18, 2013, DCFS petitioned the court to terminate the parental rights of each of S.R.’s parents and to certify S.R. as free and eligible for adoption. DCFS’s petition was based on the facts that S.R.’s legal father had executed a voluntary act of surrender and that S.R.’s mother, K.R.N., had abandoned her. See, La. Ch. C. art. 1015(4). In its petition for termination of parental rights, DCFS alleged that it had first become involved with this family in 2008 at the time of S.R.’s birth because she was born with drugs in her system. DCFS asserted that at that time, the child had been placed voluntarily in the care of the Conrads by her | ¡.mother, who had later moved out of town to Oklahoma.[1] DCFS further alleged that the mother, K.R.N., had failed to provide food, clothing and other necessities for the child; that she had failed to maintain regular contact with the child; and that other than participating in the first family team conference, K.R.N. had missed all court hearings in connection with the child in need of care proceedings. Specifically, DCFS alleged that K.R.N. had permanently avoided parental responsibility by failing to provide significant or substantial contributions to the child’s care and support for “six consecutive months, beginning on June 8, 2012.”
After a trial on the merits held on May 9, 2013, the trial court granted the petition for termination and certified S.R. as free and eligible for adoption. It is from this judgment that K.R.N. appeals.
FACTS
S.R. was born on October 4, 2008 to K.R.N. Although K.R.N. was married to F.R. at the time of the birth, F.R. is not *161 the biological father of S.R.[2] Soon after S.R.’s birth, K.R.N. began leaving her with family friends, Teri and Jeff Conrad, for long periods of time. It is apparent from the record that K.R.N. has never had physical custody of S.R. for any length of time, and that S.R. has lived the vast majority of her young life in the care of the Conrads. K.R.N. described the Con-rads as friends who would care for her daughter “like family.” While there was some evidence to indicate that S.R. was left with the Conrads when she was only days old, Ms. Conrad testified that S.R. had been with her consistently since 142009, when she was approximately one year old. K.R.N. did not dispute this testimony.
In May, 2011, K.R.N. moved to Oklahoma because she knew a man there, B.N., who had formerly lived in St. Bernard Parish. Before leaving, K.R.N. put her belongings in storage; left her then sixteen-year-old daughter, K.N., on her own in an apartment; left her four-year-old daughter in the care of her then ex-husband, F.R.;[3] and left S.R., who was then two and a half years old, in the physical custody of the Conrads. K.R.N. testified that she had to move to get away from F.R., but that she originally planned to be in Oklahoma for only one week. She said she did not take her children with her because the Conrads were planning a trip to a water park, and she did not want her daughters to be deprived of this summer fun simply because she needed to leave “to get away from him (F.R.) and establish a family in a better area away from all that for my children.” K.R.N. did not articulate any specific reasons why she had to get away from F.R., only responding: “Harassment. I had a lot of problems with him.” She also testified that it was her intention to establish a new life in Oklahoma with B.N., whom she married approximately one year after moving to Oklahoma.[4]
K.R.N. testified that, in the summer of 2011, she returned to St. Bernard Parish to get S.R. but could not do so because the Conrads had taken the child to F.R.’s house. K.R.N. returned to Oklahoma without seeing S.R. or either of her other two daughters.
In April 2012, when K.R.N. married B.N., none of her children attended the wedding. B.N. has never met S.R. or either of KR.N.’s other children, and he did |snot accompany K.R.N. to any of the court hearings in this matter. K.R.N. testified that it was never her intention to abandon her child, and that she had a room waiting for S.R. in her home in Oklahoma.
Tiffany Nelson is the foster care worker who was assigned to this case when the State took custody of S.R. Ms. Nelson testified that she did not initially have contact information for K.R.N., but that K.R.N.’s eldest daughter, K.N., contacted her mother and told her mother to call DCFS. Ms. Nelson received a telephone call from K.R.N. on June 25, 2012, at which time Ms. Nelson explained the proceedings, confirmed K.R.N.’s contact information, and informed her of the upcoming family team conference. Ms. Nelson then sent K.R.N. a letter that confirmed their conversation and provided the details of the family team conference. On July 6, 2012, K.R.N. participated in the family team conference by telephone. During the *162 conference, K.R.N. was made aware of her obligations to visit with, maintain contact with, and provide child support to S.R. K.R.N. assured Ms. Nelson that she would visit S.R.
Ms. Nelson further testified that several letters were sent to K.R.N. while S.R. was in foster care. However, Ms. Nelson did not meet K.R.N. until April of 2013 when K.R.N. came to visit S.R., which was nine months after K.R.N. had been informed that her child was in foster care and after the State had filed its petition to terminate KR.N.’s parental rights. K.R.N. did not appear at the “child in need of care” adjudication hearing or at the disposition hearing.
At the trial, K.R.N. produced receipts for two $50 money orders, dated September 21 and October 9, 2012, which she claimed she had sent to Mrs. Conrad for S.R. Mrs. Conrad acknowledged having received one of these money orders | flsometime in October near the time of S.R.’s birthday. She did not recall having received the other. The money orders in evidence do not indicate a payee. K.R.N. also produced telephone records from August and September of 2012, which indicate that she called the Conrads’ home on a few occasions. Mrs. Conrad testified that she and K.R.N. were friends and frequently talked on the phone. When she and K.R.N. would speak, K.R.N. would also speak to S.R. While she had no documentary proof, K.R.N. testified that she had sent additional money, gifts and clothes to S.R. over the years.
Testimony at trial established that S.R. is attached to Mr. and Mrs. Conrad. Ms. Nelson testified that she visited S.R. in the Conrads’ home approximately thirteen times during the year she was assigned to the case — on both announced and unannounced visits. She also observed S.R. with the Conrads on visits to the DCFS office. On each occasion, Ms. Nelson found S.R. to be well cared for by the Conrads and emotionally connected to them. Ms. Nelson testified that she had never seen S.R. exhibit any behavior that indicated S.R. was “yearning to be with her mother.”
Finally, testimony at trial established that K.N., the eighteen-year-old sister of S.R., had seen her mother only once, during a visit K.N. made to Oklahoma for Christmas of 2012, since the time her mother had moved there. Although K.R.N. had come to Louisiana in August of 2011, she had not visited or contacted K.N. at that time. K.N. further testified that she and her two sisters had not been together since their mother had moved.
At the conclusion of the trial, the court found that that State had proved by clear and convincing evidence that K.R.N. had “permanently avoided her parental responsibility by failing to significantly contribute to the child,” and further | ^concluded that “terminating parental rights [of K.R.N.] would be in the best interest of the child for permanency and stability.”
ISSUES
K.R.N. raises several assignments of error, which we consolidate for purposes of discussion:
1. Whether K.R.N. received proper notice of the proceedings;
2. Whether the trial court erred by admitting prejudicial, irrelevant hearsay testimony;
3. Whether the trial court erred in finding that the State proved, by clear and convincing evidence, that K.R.N. had legally abandoned S.R.;
4. Whether the trial court erred in finding that the State proved, by clear and convincing evidence, that termination was in the best interest of the child.
*163 DISCUSSION
Notice
The first assignment of error raises the issue of proper notice. K.R.N. contends that she was initially treated by DCFS and the trial court as a missing parent whose whereabouts were unknown even though she and the Conrads were in regular contact with each other. She further alleges that notices sent to her by DCFS and the court were addressed incorrectly and therefore were not received by her. These allegations are without merit.
It is true that DCFS initially considered K.R.N. to be an absent parent whose whereabouts were unknown. During its initial investigation, KR.N.’s eighteen-year-old daughter, K.N., was unwilling to provide DCFS with her mother’s contact information. However, K.R.N. did agree to contact her mother and ask her to 1 scontact DCFS. K.R.N. made contact with DCFS on June 25, 2012 and participated in the first family team conference. During this conference, K.R.N. was informed of her obligations and responsibilities relative to the case plan.
At trial, K.R.N. attempted to establish that she had not received letters and notices sent to her by DCFS because they were incorrectly addressed. The court found otherwise. The first letter sent to K.R.N. by certified mail was claimed by KR.N.’s husband; all others were sent by both regular and certified mail. The letters sent by regular mail were not returned. Those sent by certified mail were returned as “unclaimed.” There is no competent evidence to suggest that K.R.N. was not properly notified of these proceedings. This assignment of error is without merit.
Hearsay
The second assignment of error addresses alleged hearsay that was admitted into evidence. K.R.N. argues that the testimony on this point was not only hearsay, but irrelevant and unduly prejudicial to K.R.N.
At issue is testimony elicited from the DCFS case worker, Ms. Nelson, regarding a conversation she had with S.R. during one of her visits to the Conrads’ home. According to the testimony, S.R. told Ms. Nelson, without being prompted, that K.R.N. was “mean,” and that K.R.N. had called her (S.R.) a racially derogatory name. Over the objection of counsel, the trial court allowed Ms. Nelson to testify about this conversation. The trial judge reasoned that while it was not relevant to the issue of abandonment, it was relevant to his decision as to the child’s best interest. Ms. Nelson testified that the child was hurt by the term. In her testimony, K.R.N. stated that this was the way she and her daughter “played.”
l9The Louisiana Code of Evidence defines “hearsay” as “a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” La. C.E. art. 801(C). Ms. Nelson’s testimony regarding what S.R. related to her is not hearsay because it was not offered to prove the truth of the matter asserted. The testimony was not offered to prove that K.R.N. called her daughter a particular derogatory name, but to show how KR.N.’s behavior had negatively affected her daughter. K.R.N. testified and did not deny making the statement, but instead explained that she was “playing” with S.R. Ms. Nelson, however, testified that S.R. was hurt by her mother’s statement. The fact that K.R.N. hurt S.R., whether intentionally or not, was relevant to the trial court’s consideration of whether termination of KR.N.’s parental rights was in S.R.’s best interest. The trial court therefore did not err by admitting this *164 testimony. This assignment of error is without merit.
Sufficiency of the Evidence
The last two assignments of error essentially raise a claim for insufficiency of the evidence. The trial court, in its judgment and reasons, expressly found that the State proved, by clear and convincing evidence, that K.R.N. had abandoned her child as defined in Children’s Code article 1015(4)(b), and further found that termination of parental rights was in the best interest of the minor child. We review these findings under the manifest error standard. State ex rel. E.N., 2000-0239, pp. 10-11 (La.App. 4 Cir. 8/2/00), 774 So.2d 194, 199.
As recognized by the United States Supreme Court and by the Louisiana Supreme Court, “[t]he liberty interest in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.” State ex rel. S.M.W., 2000-3277, p. 12 (La.2/21/01), 781 So.2d 1223, 1232 (quoting Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000)). While acknowledging the importance of this interest, the Louisiana Supreme Court noted:
The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated.
2000-3277, p. 12, 781 So.2d at 1232 (quoting State ex rel J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 811-12).
With these principles in mind, we review the law of termination and the facts in the record before us. Title X of the Louisiana Children’s Code governs the involuntary termination of parental rights. Article 1015 provides the grounds for termination, one of which is abandonment. Abandonment is defined as the placing of the child “in the physical custody of a non-parent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility” by either deserting the child, failing to support the child or failing to communicate with the child. See La. Ch. C. art. 1015(4). While there are three different grounds of abandonment, the State need only establish one ground; however, the judge must also find that the termination is in the best interest of the child. See La. Ch. C. art. 1039; State ex rel. A.D.S., 2004-0250, p. 5 (La.App. 4 Cir. 9/29/04), 888 So.2d 913, 917. As this court has held:
Termination of parental rights is a two prong inquiry: (1) the State, by clear and convincing evidence, must establish at least one statutory ground for termination and (2) only after a finding that at least one of the statutory grounds is satisfied, the trial court must determine | ^whether the termination is in the child’s best interest. State ex rel. L.B. v. G.B.B. 2002-1715 (La.12/4/02), 831 So.2d 918.
2004-0250, p. 9, 888 So.2d at 919.
In this instance, the State alleged in its petition that KR.N.’s rights should be terminated because, as of the time the petition for termination of parental rights *165 was filed, she had “failed to provide significant contributions to the child’s care and support for any period of six consecutive months” as provided for in Louisiana Children’s Code article 1015(4)(b) and had failed to “maintain significant contact with the child by visiting [her] or communicating with [her] for any period of six consecutive months,” as provided for in Louisiana Children’s Code article 1015(4)(c).
The record fully supports the trial court’s conclusions in this case. K.R.N. voluntarily placed her infant daughter in the care of Teri and Jeff Conrad when S.R. was younger than one year. K.R.N. initially visited S.R. while she was in the Conrads’ home, but there is no evidence that she ever provided “significant contributions” to the child’s care or support. By all accounts, the Conrads have cared for, supported and nurtured this child for most of her short life.
During trial, K.R.N. was unable to state, with any kind of specificity, when, if ever, S.R. had lived with her. In 2011, when K.R.N. left Louisiana for Oklahoma, she left without providing any money, clothes or support for S.R. and without providing the Conrads with any legal authority to care for S.R. in the event of an emergency. While K.R.N. testified that she only intended to go to Oklahoma for a week and did not intend to permanently leave S.R. with the Conrads, her actions prove otherwise. Prior to leaving for Oklahoma, K.R.N. put all of her belongings in storage and did not maintain a place in Louisiana to live. Further, by 112the time K.R.N. left for Oklahoma, S.R. had been in the care and custody of the Conrads for at least a year and a half.
Similarly, K.R.N.’s testimony that she had returned in August of 2011 to get S.R. but was prevented from doing so by the Conrads is called into question by her actions. K.R.N. did not attempt at that time to retrieve the child from her legal father, F.R., to whom the Conrads supposedly had sent S.R.; nor did K.R.N. make any attempt to visit either of her other daughters while in Louisiana. Moreover, K.R.N. took no action (legal or otherwise) to gain access to S.R. during the eight months between that trip and the time DCFS became involved. Further, once DCFS informed K.R.N. of the steps she needed to take to be reunited with S.R., K.R.N. was non-compliant. From the time she went to Oklahoma in 2011 up until the date the petition for termination was filed, K.R.N. paid a single money order of $50 for the support of S.R., and participated in only one family team conference.
As this court has recognized, the “lack of financial support and the failure to comport with the family reunification or case plan” are factors which support a finding of abandonment. State ex rel. A.D.S., supra, p. 9, 888 So.2d at 917.
K.R.N. testified that she did not intend to abandon her child. She expressed love for her daughter. This court does not doubt her intentions or her love. However, children need more. “[P]arental responsibilities are not fulfilled by merely expressing concern or having good intentions.” State in Interest of D.L., 457 So.2d 141, 146 (La.App. 2d Cir.1984). S.R. is totally dependent on the adults in her life to care for her, protect her, support her and love her. It is clear from the evidence presented that K.R.N. was unable or unwilling to provide for these basic needs of her child.
11sFortunately for S.R., the Conrads have willingly provided for her safety and protection during her young years. And, they have done more. All of the evidence indicates that S.R. is well cared for and has bonded to the Conrads. They have provided her with a safe, loving and per *166 manent home and have stated their intention to adopt her should she be freed for adoption. It is also evident from these proceedings that S.R. enjoys a close and loving relationship with her older sister, K.N. — a relationship that has been fostered by the Conrads, not by K.R.N. As noted by our Supreme Court: “It is undisputed that children require stable, long-term, continuous relationships with their parents or foster parents.” State ex rel. D.L.R., 2008-1541, p. 17 (La.12/12/08), 998 So.2d 681, 691 (quoting Lehman v. Lycoming County Children’s Serv. Agency, 458 U.S. 502, 513, 102 S.Ct. 3281, 3238, 73 L.Ed.2d 928(1982)). In this case, that stability has been provided by the Conrads.
We find no manifest error in the trial court’s findings that the State proved abandonment and that the termination of parental rights is in the best interest of this child. Accordingly, we affirm the judgment of the trial court terminating the parental rights of K.R.N. and F.R. to the child, S.R., and declaring S.R. to be free and eligible for adoption.
AFFIRMED.

. It is unclear from the record whether DCFS was involved in the voluntary placement of S.R. and/or whether they had any contact with S.R., the Conrads or either of S.R.'s parents from the time S.R. was voluntarily placed with the Conrads in 2008 until the report in April of 2012 which triggered these proceedings.

. There is no evidence in the record as to the identity of S.R.’s biological father.

. K.R.N. and F.R. had been divorced since 2009.

.There is nothing in the record to suggest that B.N. is S.R.'s biological father.