**STATE OF LOUISIANA IN THE INTEREST OF Z.B.**

\* NO. 2025-CA-0771

\* COURT OF APPEAL

\* FOURTH CIRCUIT

\* STATE OF LOUISIANA

\* \* \* \* \* \* \*

APPEAL FROM
JUVENILE COURT ORLEANS PARISH
NO. 2025-156-06-TR, SECTION "E"
HONORABLE Desiree Cook-Calvin, JUDGE
\* \* \* \* \* \*
**Judge Rachael D. Johnson**
\* \* \* \* \* \*
(Court composed of Judge Tiffany Gautier Chase, Judge Dale N. Atkins, Judge Rachael D. Johnson)

Annette Fuller Roach
CINC APPELLATE PROJECT OF THE OFFICE OF THE STATE PUBLIC DEFENDER
ROACH & ROACH, APLC
2720 Rue de Jardin
Lake Charles, LA 70605

     COUNSEL FOR APPELLANT

Jules A. Fontana, III, La. Bar #22050
Department of Children and Family Services
Bureau of General Counsel
1450 Poydras St., Suite 1600
New Orleans, La. 70112

     COUNSEL FOR APPELLEE

**AFFIRMED**
**FEBRUARY 13, 2026**

Appellant, M.B., appeals the trial court's September 9, 2025 judgment, signed on October 3, 2025, terminating her parental rights to her child, Z.B. Finding no manifest error, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

Z.B. was born substance affected on August 12, 2024. She tested positive for fentanyl and suffered withdrawal symptoms. She was released from the hospital around August 30, 2024, into the care of the Department of Children and Family Services (DCFS). On September 4, 2024, the court found that Z.B. was "in need of care, abused, or neglected," and that despite DCFS's reasonable efforts to prevent or eliminate the need for Z.B.'s removal, returning the child to mother M.B. was "contrary to her safety, health, and well-being." Thus, the court continued the child in the custody of the State. The court recommended that all parties be advised of their rights and that DCFS set up visitation for Z.B.'s parents and refer M.B. for substance abuse treatments.

On September 24, 2024, DCFS filed a child in need of care petition on behalf of Z.B. M.B.'s appointed counsel filed an answer in October denying the

allegations set forth in the petition (except that she is Z.B.'s mother). M.B. was absent from the October hearing.

During the November 4, 2024 hearing, Child Protective Investigator Anthony Reed testified about his visit to M.B.'s home. He stated that M.B. admitted to using drugs. He also explained that he was able to do one home visit when the case initially began, and he left his contact information with M.B., but he had no contact with her since he performed the home assessment. The court found Z.B. to be a child in need of care based on dependency. Additionally, the court ordered DCFS to "make diligent efforts to locate relatives or fictive kin that may be available for placement." M.B. was absent from this hearing.

A disposition hearing was held on December 12, 2024, after which the court ordered that Z.B. remain in DCFS's custody. As DCFS recommended, the court adopted the case plan goal of reunification/adoption. The court further stated that M.B. was required to do the following: maintain a safe and stable living environment for the child; submit to monthly home visits from DCFS; provide gifts in lieu of parental contribution of $25 per month; participate in parenting classes; participate in a mental health assessment; notify DCFS of her whereabouts; participate in permanency planning; provide relative resources; and visit with her child as provided in the visitation contract. The court again ordered DCFS to find relatives available for placement. M.B. was absent from this hearing.

On March 11, 2025, the first case review hearing was held. The case plan goal remained reunification concurrent with adoption by either Z.B.'s maternal aunt or her paternal aunt. M.B. was absent from this hearing.

On April 22, 2025, the court changed Z.B.'s case plan goal to adoption. The judgment noted that there had been "no contact with the parent and no visits." The

court found that DCFS "has made reasonable efforts in accomplishing the case plan goal of reunification with the concurrent plan of adoption." M.B. was absent from this hearing.

In June 2025, DCFS filed the Petition for Termination of Parental Rights of M.B. Counsel for M.B. filed an answer on June 18, 2025. On that same day, the trial court ordered that the Orleans Public Defender's Office assign a curator to locate M.B., whose whereabouts were unknown.

Kimberly Majors, the DCFS case manager for Z.B. and her family, authored a court report in July 2025. In this report, she wrote "the agency was unable to assess the stability of M.B. as she has not made herself available to the agency and caseworker." According to the report, the efforts to locate M.B. included Vinelink, clear search, and parent locator. Later, the report reiterated that M.B. "has not been cooperating with the agency by making herself available to the agency." Ms. Majors noted that "[t]his case can be closed when M.B. make[s] significant measureable [sic] progress on her case plan addressing all risk factors that caused the child to enter foster care and/or permanency is met."

Ms. Majors stated that M.B. "has not had any visits," including phone calls and virtual visits. Contrastingly, Z.B.'s paternal aunt expressed her interest in providing permanency since the onset of the case, maintained contact with DCFS, and made herself available for in-person visits. Z.B. had a two-day overnight visit with her paternal aunt, which the worker noted went very well.

The report also specified that M.B. admitted to using heroin during the course of the investigation and even once or twice daily throughout her pregnancy. M.B.'s "Structured Decision Making" risk level was ranked as "very high."

When the foster care supervisor spoke with M.B. over the phone, M.B. expressed her wish for Z.B.'s paternal aunt to have custody of her daughter:

> When asked why she chose paternal aunt . . . over maternal aunt . . . [M.B.] stated, she has not been able to have a relationship with her [other] daughter [previously taken by DCFS and placed with the maternal aunt], see her, wish her happy birthday or receive any pictures. She feels she will be allowed to get updates on [Z.B.'s] progress and receive pictures and be allowed to tell her happy birthday if she is with [her paternal aunt].

Ms. Majors further emphasized that M.B. does not adequately prioritize the needs and well-being of her child. The "case plan goals and steps" portion of the report spelled out that M.B. must: maintain a safe and stable living environment for Z.B.; make herself available for monthly home visits with the agency worker; keep in contact with the worker; provide gifts for her child each month until she obtains employment; visit her daughter according to the visitation contract outlined in the case plan; participate in infant education programs; complete a mental health assessment and follow up with recommended treatment; and complete substance abuse treatment.

On July 10, 2025, Ms. Majors and a DCFS supervisor notified the court that Z.B. would be placed with her paternal aunt in Texas. The letter explained that the paternal aunt had traveled to New Orleans several times to visit Z.B. The letter concluded by saying both M.B. and the father "expressed their desire for [Z.B.] to be placed with [her paternal aunt]" and that M.B. "reported being happy because [the paternal aunt] will keep in touch with her and provide photos" of Z.B.

On July 15, 2025, a pre-hearing conference was conducted in accordance with Louisiana Children's Code article 1025.4. There, the State articulated that M.B.'s failure to visit Z.B. or contribute monetarily for at least 6 months were grounds for termination of her parental rights, pursuant to Louisiana Children's

Code article 1015(4)(B) and (C). The court directed M.B.'s counsel, rather than DCFS, to contact M.B., Z.B.'s maternal aunt, and Z.B.'s foster parents. M.B. was present at this hearing.

On August 6, 2025, a permanency planning hearing was held. The court found that it was "unable to reach the conclusion that the current placement is not in the child's best interest based on the evidence presented." M.B. was present at this hearing.

Trial was held in September 2025. Ms. Majors testified that M.B. did not visit or make any monetary contributions to Z.B. since she came into DCFS's care in August 2024. DCFS has an open visitation policy, so M.B. could have visited any day Monday through Friday, but she never did. Though DCFS offered M.B. drug treatment services, mental health services, and parenting education, M.B. did not use any of those services.

On cross examination, Ms. Majors stated that neither she nor DCFS facilitated or scheduled contact between M.B. and Z.B. When asked if she could recall the last time M.B. had contact with Z.B., Ms. Majors explained that she knew M.B. had never visited nor contacted Z.B. in person, but she was "not aware if" telephone or FaceTime contact occurred. M.B.'s counsel did not further traverse her on this point and did not offer any evidence that there was contact between M.B. and Z.B. within the six-month requisite time period. Though Ms. Majors explained it was DCFS procedure to give parents a case plan, she did not know exactly when M.B. received a case plan, only that it was before she was assigned the case in April 2025. She could confirm that DCFS submitted a case plan to the court, but nothing in the record proved that M.B. received it.

Counsel for M.B. pointed out that the DCFS forms which track visits with parents showed several months where DCFS workers did not visit M.B., even though it was DCFS's policy to visit parents at least once a month. Ms. Majors expressed her belief that workers visited M.B. prior to her taking over the case, but she could not recall specific details.

Similarly, Ms. Majors acknowledged that despite DCFS's policy to contact the parent at least once a month, DCFS had no documentation of contacting M.B. before the filing of the petition for termination in June 2025. Ms. Majors believed DCFS contacted M.B. before June 2025, but this information was not documented in the visit notes. Ms. Majors conceded that although this information should be documented, she does not always document attempted contacts, *i.e.*, when she calls and leaves a message.

Ms. Majors noted the paternal aunt to be a potential adoptive placement and expressed the agency's belief that freeing Z.B. for adoption would be in her best interest. M.B. did not provide any evidence or witnesses at the hearing.

On October 3, 2025, the trial judge signed the judgment terminating M.B.'s parental rights. The court found that DCFS established that M.B. failed to provide significant monetary contributions to Z.B.'s care and failed to remain in contact with Z.B. for over six months, thus amounting to abandonment per Louisiana Children's Code article 1015(4)(B) and (C). The court thereby rejected M.B.'s argument that DCFS did not sufficiently facilitate visits between herself and Z.B. and did not inform her of her duty to make financial contributions. Instead, the court reasoned that M.B. should have known Z.B. was in DCFS's care, and thus, she should have initiated contact with DCFS if she wanted to visit her daughter.

Counsel for M.B. filed a Motion and Order for Suspensive Appeal on October 14, 2025, which the court granted the next day. This Court granted M.B.'s motion to enroll undersigned counsel as appellate counsel of record on November 24, 2025.

## ASSIGNMENTS OF ERROR

M.B. submits two assignments of error on appeal. First, the trial court committed manifest error in concluding that the State had presented sufficient clear and convincing evidence to warrant termination of M.B.'s parental rights to her child, Z.B. Second, the trial court committed manifest error in finding that termination of M.B.'s parental rights was in the best interest of the child, Z.B.

M.B. also submitted a motion to strike DCFS's court reports to the trial court. We will dispose of the motion to strike before addressing the assignments of error.

## STANDARD OF REVIEW

This Court has previously stated:

> This Court reviews a trial court's finding on the termination of parental rights under a manifest error standard of review. *State in the Interest of A.S.*, 2017-0028, p. 4 (La. App. 4 Cir. 5/10/17), 220 So. 3d 179, 183. "[B]oth prongs of the trial court's determination—whether the statutory grounds for termination have been established and whether termination of parental rights is in the child's best interest..." are considered under the manifest error standard. *State in the Interest of E.R.*, 2022-0754, p. 4 (La. App. 4 Cir. 2/7/23), 357 So. 3d 892, 895, *writ denied*, 2023-00346 (La. 4/12/23), 359 So. 3d 24 (citation omitted).

*State in the Interest of O.T.*, 2024-0004, p. 4 (La. App. 4 Cir. 3/6/24), 385 So. 3d 298, 301. Under the manifest error standard of review, "to reverse a trial court's factual findings, the appellate court must: (1) find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) determine that

7

the record establishes the finding is clearly wrong or manifestly erroneous." *Neathamer v. Singleton*, 2015-0411, p. 6 (La. App. 5 Cir. 12/23/15), 182 So. 3d 406, 410, *writ denied*, 2016-0239 (La. 4/4/16), 190 So. 3d 1206 (citing *Stobart v. State through Dep't of Transp. and Dev.*, 617 So. 2d 880, 882 (La. 1993)). Thus, an appellate court must simply determine whether the trial court's conclusion was reasonable; if so, the court of appeal may not reverse. *See id.*

**DISCUSSION**

Motion to Strike

M.B. moved to strike two court reports that were submitted directly to the court but which were not referenced nor admitted at the termination of parental rights proceedings. Because M.B. did not have a chance to view these reports and cross-examine DCFS about the contents during the proceedings, M.B. argues that these reports amount to inadmissible hearsay and should not be considered by this Court on appeal. We disagree.

In its September 4, 2025 judgment, the trial court stated that it was taking judicial notice of the underlying Child in Need of Care (CINC) case. As per Louisiana Children's Code article 1036.1(A), "[i]f the prior [CINC] judgment was entered by the same court, it may take judicial notice of its own records." Here, the trial court entered the judgment that Z.B. was a CINC on November 14, 2024. Thus, when the trial court took judicial notice of the underlying CINC case in the termination of parental rights proceedings, this notice included the court reports. Accordingly, the motion to strike is denied.

Sufficient Grounds for Termination

M.B. argues on appeal that the state failed to meet its burden of proving that the statutory grounds for termination of parental rights exist in the present case.

8

> A judicial determination of a termination of parental rights involves a two-pronged inquiry. The district court must find that (1) DCFS established each element of at least one statutory ground for termination by clear and convincing evidence; and (2) after the district court finds that a ground for termination exists, the district court must determine that termination is in the best interest of the child.

*State in the Interest of G.K.*, 2024-0163, pp. 5-6 (La. App. 4 Cir. 6/26/24), 399 So. 3d 433, 438 (citing *State in the Interest of E.R.*, 2022-0754, p. 6 (La. App. 4 Cir. 2/7/23), 357 So. 3d 892, 896). *See also* La. Ch.C. art. 1035(A); La. Ch.C. art. 1037(B)(1). Thus, our inquiry on appeal here is two-fold. First, we must determine whether the trial court manifestly erred in finding that the state proved by clear and convincing evidence at least one ground for the termination of M.B.'s parental rights under Louisiana Children's Code article 1015. Second, we must determine whether the trial court manifestly erred in concluding that the termination of M.B.'s parental rights was in the best interest of Z.B.

One of the enumerated grounds for termination of parental rights under Louisiana Children's Code article 1015 is abandonment. "While there are three different grounds of abandonment, the State need only establish one ground." *State in the Interest of S.R.*, 2013-1072, p. 10 (La. App. 4 Cir. 2/12/14), 136 So. 3d 158, 164.

Here, the trial court found that the State established the following grounds for abandonment under Louisiana Children's Code article 1015(4):

> (4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> . . .
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

Abandonment under Louisiana Children's Code article 1015(4)(B) is demonstrated by a parent's failure to provide significant contributions to the child's care and support for a period of six consecutive months. Here, M.B. contends on appeal that DCFS did not make a diligent effort to locate her and inform her of her financial obligations. Further, M.B. argues she was only required to provide gifts in lieu of the required parental contribution of $25 per month.

Ms. Majors' July 2025 report states that DCFS's efforts to locate M.B. included "Vinelink, clear search, and parent locator." When the trial court changed the case plan goal in April 2025, it stated that DCFS "has made reasonable efforts in accomplishing the case plan goal of reunification with the concurrent plan of adoption." This determination by the court does not comport with M.B.'s argument that DCFS did not make a diligent effort to locate her and inform her of her financial obligations.

Moreover, as was noted in its reasons for judgment, the trial court was unable to locate M.B. until "just recently" before trial. On June 18, 2025, when M.B.'s counsel filed an answer to the petition for termination of parental rights, M.B.'s whereabouts were still unknown and the court had to assign a curator ad hoc to locate her. Louisiana Children's Code article 1024 bestows upon the curator ad hoc the duty to locate the parent and notify her of the pendency and nature of the proceedings, including the allegations against her. This means that when the curator finally located M.B., he or she had the responsibility to inform her of the grounds DCFS asserted in its petition to terminate her parental rights. It is unclear

10

how DCFS would be able to inform M.B. of her obligation to monetarily contribute to her child, so as to retain her parental rights, when DCFS was unable to locate M.B.

Regarding the modified requirement to provide gifts, trial court did indeed order on December 12, 2024, that M.B. "provide gifts in lieu of [the required] parental contribution of $25 per month." However, M.B. did not present any evidence that controverted or disproved DCFS's showing that she failed to fulfill this modified requirement. The trial court did not manifestly err in finding that DCFS proved M.B.'s abandonment of Z.B. on this ground by clear and convincing evidence.

The court also found that M.B. abandoned Z.B. pursuant to Louisiana Children's Code article 1015(4)(C). Abandonment under this subsection is demonstrated by a parent's failure to maintain significant contact with the child by visiting her or communicating with her for a period of six consecutive months.

On appeal, M.B.'s arguments on this point do not deny that she did not visit or contact Z.B. for over six months, but instead imply that this was the fault of DCFS. Specifically, M.B. claims that DCFS did not make a diligent effort to locate her and inform her of her visitation rights and that DCFS did not adequately facilitate a relationship between herself and the child. M.B. references Ms. Majors' testimony in which she stated that she did not contact M.B. until after the petition was filed. Further, Ms. Majors could not prove that M.B. received a case plan.

As stated above, the trial court could not locate M.B. until just before trial. Considering that M.B.'s whereabouts were unknown, it is unclear how Ms. Majors would have informed M.B. that she must maintain contact with her child if she wanted to retain her parental rights. As noted above, Ms. Majors' July 2025 report

11

states that DCFS's efforts to locate M.B. included "Vinelink, clear search, and parent locator." This report further documented that M.B. was failing to make herself available for monthly home visits with the agency worker and to keep in contact with the worker.

Ms. Majors became affiliated with this case in April 2025, the same month as when the court changed the case plan goal solely to adoption rather than concurrently with reunification. In changing the case plan goal, the court found at the April 2025 hearing that DCFS "has made reasonable efforts in accomplishing the case plan goal of reunification with the concurrent plan of adoption." The trial court therefore has already determined that DCFS did its due diligence in trying to reunify M.B. and Z.B.

Undoubtedly, DCFS and Ms. Majors made diligent efforts to locate M.B. These facts suggest that it is M.B., not DCFS or Ms. Majors, who failed to make diligent efforts to maintain contact with the agency and her child.

At trial, Ms. Majors did concede that she could not prove whether M.B. received a case plan (potentially due to her unknown whereabouts/lack of participation in the development of the case). Nonetheless, the record shows that DCFS submitted a case plan to the court. M.B. had the ability to view the case plan if she so desired.

These considerations are ultimately unnecessary, as it was not DCFS's responsibility to ensure M.B. maintained contact with her child. M.B. has not refuted DCFS's showing that she failed to visit or contact Z.B. for at least six months. The trial court did not manifestly err in finding that DCFS proved M.B.'s abandonment of Z.B. on this ground by clear and convincing evidence.

Best Interest of the Child

After the State proves by clear and convincing evidence a statutory ground for termination of parental rights, "the judge must also find that the termination is in the best interest of the child." *State in the Interest of S.R.*, 2013-1072 at p. 10, 136 So. 3d at 164.

Ms. Majors testified at trial that Z.B.'s placement with her paternal aunt was "meeting all of her needs" and that adoption by this aunt would be in Z.B.'s best interest. In her July 2025 report and letter, Ms. Majors explained that Z.B.'s paternal aunt expressed her interest in providing permanency since the onset of the case, maintained contact with DCFS, and made herself available for in-person visits. She even traveled to New Orleans to do a two-day overnight visit with Z.B., which Ms. Majors said went very well. In fact, the letter detailed M.B.'s desire for Z.B. to be placed with the child's paternal aunt because the aunt would keep in touch with M.B. and provide photos of Z.B.

In its August 6, 2025 judgment following the permanency planning hearing, the trial court reasoned:

> The Court cannot dictate where the child is placed, but the Court can find that the placement is specifically not in the child's best interest; the Court is unable to reach the conclusion that the current placement [with her paternal aunt] is not in the child's best interest based on the evidence presented to the Court; the child seems to be in good placement with family.

In stark contrast, M.B. has showed a lack of initiative in fostering a relationship with her child.

DCFS removed Z.B. from M.B. at the hospital, just after birth. Thus, M.B. was or should have been aware that Z.B. was in DCFS's custody. Ms. Majors testified about DCFS's open visitation policy, meaning M.B. could have visited

13

Z.B. in person any day Monday through Friday; nonetheless, M.B. never visited Z.B. between August 2024 and the filing of the petition for termination of parental rights in June 2025.

An investigator visited M.B. sometime around November 2024, but M.B. failed to maintain contact with him. During that visit, M.B. admitted to using drugs. The July 2025 court report also stated that M.B. admitted to using heroin during the course of the investigation (though an exact timeline is unclear) and even once or twice daily throughout her pregnancy. It also repeatedly noted that M.B. failed to make herself available to the agency.

M.B. failed to attend any hearing before the July 15, 2025 pre-hearing conference, which occurred after DCFS had already filed the petition for termination of parental rights. Ms. Majors noted at trial that M.B. had still not utilized any of the mental health, drug rehabilitation, or parenting education services DCFS offered her.

Taken together, these facts demonstrate that it is within the best interest of Z.B. to terminate M.B.'s parental rights.

We are aware of what is at stake in reaching this decision. Permanent termination of parental rights between natural parent and child is certainly "one of the most drastic actions the state can take against its citizens." *State in the Interest of A.L.D.*, 2018-1271, p. 4 (La. 1/30/19), 263 So. 3d 860, 863. This Court has previously acknowledged the "unique concerns" regarding termination of parental rights:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the

law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing those interest, **the courts of this state have consistently found the interest of the child to be paramount over that of the parent.**

*State in the Interest of C.M.*, 2021-0353, p. 6 (La. App. 4 Cir. 8/4/21), 325 So. 3d 1148, 1153 (quoting *State ex rel. H.A.S.*, 2010-1529, pp. 11-12 (La. 11/30/10), 52 So. 3d 852, 859) (emphasis added).

In its final judgment, the trial court reasoned that Z.B. deserves to have permanency, noting that "based on her age and stage of life it is important for her to get permanency." Further, the court explained that Z.B. "has been placed with paternal relatives and there's indication that the family will remain in contact and allow [M.B.] to have contact with the child going forward."

Upon review of the record, we find that the trial court did not err in finding that terminating M.B.'s parental rights was in the best interest of Z.B.

## CONCLUSION

DCFS established, through Ms. Majors' testimony and reports, that M.B. did not visit or financially contribute to Z.B. for a period of over six months. DCFS also established that Z.B.'s current placement with her paternal aunt meets all of her needs. M.B. did not produce evidence to controvert this showing. The trial court did not manifestly err in finding that DCFS proved by clear and convincing evidence that the statutory grounds existed for terminating M.B.'s parental rights to Z.B. and that such termination is within Z.B.'s best interest.

**AFFIRMED**